**Carmen MOCHIZUKI, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 97–294C.

United States Court of Federal Claims.

Jan. 25, 1999.

Robin Toma, Los Angeles, CA, with Fred Okrand, for plaintiffs.

Elizabeth Strange, Washington, D.C., with whom were Tink Cooper, Office of Redress Administration, Vincent M. Garvey, Deputy Director, Federal Programs Branch, Civil Division, U.S. Department of Justice, for defendant.

### OPINION AND ORDER

SMITH, Chief Judge.

The court approves the settlement of this case based upon the moving and eloquent testimony of several of the class members as well as plaintiffs' fine lawyers. The court believes those class members' statements provide valuable insight into the tragic experiences of Latin Americans of Japanese descent who were interned here during World War II. Accordingly the court has decided to append copies of their statements to this order so that their account of those trying times can be more widely known.

No settlement is ever perfect. No compensation is ever equivalent to a serious human loss. Who among us would ever trade our eyes or legs for $5,000 or $20,000 or a hundred times that much? Money damages can never undo the loss of life, false imprisonment or the passage of years. Money, however, is the medium which the law must use as it seeks to right wrongs. It must use this medium with the full recognition that it is never truly adequate.

The Twentieth Century has seen untold human suffering wrought by the hands of human beings. The World War out of which this case came was perhaps a pinnacle of mankind's ability to inflict evil upon fellow human beings. I hope we never reach that level again. The statute enacted by the Congress to compensate Americans of Japanese descent was not perfect, however it was a highly moral action. It was an attempt to right a wrong. As such it marks an important milestone in the long road toward decent and civilized life. Few governments over the millennia have even acknowledged past evil, let alone made serious efforts to correct it. We can be very proud of this country for doing so.

Thus, while the wrong is far from perfectly assuaged, the court must acknowledge this as a fair settlement. The plaintiffs asked for the court's help in ensuring additional funding for the settlement. This is beyond the court's constitutional power. However, the court hopes that the Congress and the President will give due consideration to fully funding the settlement so that all identified class members' may be paid the modest amount that will serve as a symbol of restitution rather than actual monetary damages. The court must also commend the attorneys and administrative officials of the United States Department of Justice who have worked hard and diligently to handle this settlement and other aspects of the whole claims process.

Upon consideration of the proceedings heretofore conducted in this case and a hearing having been held to determine the fairness, reasonableness and adequacy of the Settlement Agreement executed by the parties on June 10, 1998, it is by this court hereby ORDERED, ADJUDGED AND DECREED that:

1. Pursuant to RCFC 23, the court determines that it is in the interest of justice to certify a class consisting of:

Persons who have not previously received payments under the Civil Liberties Act of 1998 from the Office of Redress Administration, United States Department of Justice, and who are (a) persons of Japanese ancestry who were living in Latin America before World War II and who were interned in the United States at any time during the period from December 7, 1941, to June 30, 1946; or (b) persons who are the spouses, children or parents of persons who died after August 10, 1988, and who met the qualifications of (a) above.

Persons who have timely opted out of the class are not included as class members. The court further determines that, for the purposes of settlement, certification of this class is appropriate due to the number of potential class members, the predominance of common questions over questions affecting individual class members, the expiration of the statutory program at issue in this case, and the fact that the current plaintiffs and their attorneys are adequate representatives of the class.

2. The Settlement Agreement executed by the parties on June 10, 1998, is adjudged to be fair, reasonable, and adequate, and its terms are hereby approved.

3. The Second Amended Complaint is dismissed with prejudice.

4. The court shall retain jurisdiction of this action for a period of 180 days after entry of this order and judgment solely for the purpose of adjudicating any claim of a material breach of the Settlement Agreement.

5. In accordance with this order, judgment is hereby entered approving the settlement as proposed in all respects and dismissing the Second Amended Complaint with prejudice.

**IT IS SO ORDERED.**

## APPENDIX

**consisting of the declarations of Carmen Mochizuki, Kazuo Matsubayashi, Rose A. Nishimura, Saduharu Sakamoto, and Grace Shimizu regarding the reaction of members of the class to the Settlement Agreement.**

*Declaration of Carmen Mochizuki*

I, Carmen Mochizuki, have personal knowledge of the facts stated herein. If called to testify, I could and would competently testify as follows:

1. My name is Carmen Higa Mochizuki. I am one of the named plaintiffs in this lawsuit, *Mochizuki, et al. v. U.S..* I appreciate the chance to let Chief Judge Smith know how I feel about the agreement, why I agreed to it, and what my concerns are today.

2. I was born on December 9, 1932 in Callao, Peru. My parents, Rensuke and Kamado Higa, raised me along with my nine brothers and sisters on a large farm. I am now 67 years old and use my husband's surname.

2. During World War II, in March, 1944, my family and I were abducted and forcibly removed from Peru and taken to Crystal City, Texas where we lived for almost two years in an internment camp.

3. In Peru, my father had been a successful farmer. He was well respected as an accomplished horseman and was a leader in the community. I am informed and believe that it was because of my father's leadership in the community, that he was targeted for arrest by the United States and the Peruvian governments.

4. I was 11 years old at that time. The Peruvian police came to my school and demanded that I take them to my father. They walked with me to my home and I told them that I would have to go around to the back of the house to open the door. I warned my father who then escaped out a back window.

5. He evaded arrest for one year, but when he was threatened with life imprisonment with no contact with his family, he turned himself in to the F.B.I. The government took control of all of the family's assets. We lost everything. We were shipped to Crystal City internment camp. I remember in New Orleans, after we got off the ship, how embarassed I felt as a little girl when they made my mother and the children remove all of our clothing so that they could spray us with some insecticide.

6. In December, 1945, after the war ended, the family was deported to war-devastated Japan. The family nearly starved. In order to get a pound of sweet potatoes or a pound of rice, we exchanged a pair of shoes or a dress.

7. My parents are the ones who suffered so much, but now they are gone. My father died in Okinawa a few years after the war's end. He was only 63 years old. My mother must have felt so helpless not being able to explain the suffering that we were going through. I feel so sorry when I think of my parents, and I'll feel that until I die. I eventually returned to the U.S. and married a U.S. citizen.

8. Today when I see the homeless, the suffering people in this country, I know what they are suffering. If I didn't go through that in Japan, I would be a different person today.

9. I tell this painful story in remembrance of my family, so that others will know how devastating this event was for us. Although I was just a young girl, I know that what happened to us was a grave injustice and it should never occur again in a civilized world. I hope with all of my heart that no group will ever have to undergo such an experience.

10. I support the decision to settle the class action lawsuit of *Carmen Mochizuki vs. the United States of America,* however, with reservations. Although my family and others suffered the loss of liberty, freedom and assets as a direct result of the action of the United States of America, we can never be adequately repaid. The United States government has seen fit to compound the travesty by offering to settle this case for less than was deemed necessary for others interned under the same conditions.

11. The United States government has issued an official apology and determined a set amount as redress to its citizens whom it illegally and wrongfully deprived of freedom and livelihood. Why would the people, although not citizens of the United States of America at that time, who were kidnapped from their own country, and interned in the United States by the United States, be entitled to any less?

12. Also, I am very worried about many, and maybe all, of the Japanese Latin Americans not receiving the $5,000 redress payment, which was the main purpose of the settlement agreement. I was very upset to find out that the U.S. government broke the law and did not pay interest on the redress monies, and because of it, so many of us who have suffered and waited so long for justice, may end up not receiving any redress payment at all.

13. The process of seeking justice and closure for this dark period of time has drained me. Reliving the terror and loss has produced this end. It is under this strain and with these reservations that I thankfully and gratefully accept the settlement as a tribute to the efforts of those who have diligently and righteously fought for what is true, right and just.

I swear under the penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed on January 5, 1999, at Los Angeles, California.

/s/Carmen Mochizuki
Carmen Mochizuki

### DECLARATION OF KAZUO MATSUBAYASHI

I, Kazuo Matsubayashi, do declare as follows:

1. If called to testify, I could and would do so competently on the matters stated in this declaration, which are based on personal knowledge or information and belief. This declaration was done in connection with the

case. Mochizuki v. U.S. (Case No. 97–294C), in the U.S. Court of Federal Claims.

2. I appreciate the opportunity to tell the Court my story. I think it will help you understand my feelings about the Settlement Agreement in this case.

3. I was born in Lima, Peru in 1937.

4. I had two uncles, Shigezo Matsubayashi and Fukuichi Ikeda, who went to Peru as immigrants probably in the early 1920s, first as farm workers. It was a hard life, they said, and they soon ran away from the farm. They became very successful businessmen.

5. I had many cousins in Peru, 11 altogether, and had many wonderful picnics, birthday parties, and other gatherings.

6. The earliest vivid memory in my life is the day my father was arrested on January 7th, 1943. My mother took me to the police station where my father and many Japanese men were being loaded on trucks. I remember my father shouting something to us from the back of the truck as it left the compound, but I could not hear what he was saying. Even at the age of less than six, I felt some invisible force was changing our lives. We did not know where my father went or why he was taken for several weeks until, one day, we received a letter from him saying he was in the United States.

7. Eight months after my father's disappearance, we were shipped to New Orleans through Panama Canal, and one hot summer afternoon in 1943, we joined my father at the Crystal City Concentration Camp in Western Texas. My Uncle Fukuichi Ikeda and his family had been arrested right after the war broke out, and they were sent to Japan as part of the prisoner exchange between the U.S. and Japan.

8. In those days, I remember my younger brother who was just a little over two and half years old then, was very sickly since his birth, and my mother feared he would not survive the ordeals.

9. These experiences really hit me strongly when I had my own little daughters. I often thought about how I would have felt if I were the one on that truck in that police station in Lima and being driven away to somewhere unknown and not to be able to see my wife and children for eight months. My father did say that they thought they were going to be taken away somewhere to be killed. My mother was very young, only 25 years old, and did not speak Spanish nor English.

10. Perhaps all these little stories are meaningless in the context of the war where millions of people were killed and suffered. My father used to tell me that it was totally stupid for Japan to start the war, and many Japanese in the camp even felt guilty being Japanese. But it is also true that many did felt great injustice was done to them without knowing whom to blame. I am now older than my uncle Shigezo when he died, and I can imagine the despair he must have felt.

11. We all probably have different memories of life in the camp. The tall barb wire fence and watch towers with the shadows of guards were always present, and we were told never to touch the fence otherwise we will be shot by the guards. Beyond the fence was vast western Texas desert. I recall the black widows, Texas horn toads, scorpions, grasshoppers and large centipedes, and rattle snakes. There were torrential storms with most incredible lightening and loud thundering. The barracks were built by exposed two-by-four construction with only sheet rock enclosure, so these storms were quite frightening.

12. My youngest brother was born in the camp as well another cousin. It is ironic that these two—who have no memory of the camp, or suffered the deprivations and trauma of being uprooted from Peru—received redress. The law is about fairness, but it seems rather odd that the distinction is quite arbitrarily made for simplicity disregarding the real life of individuals.

13. As the war came to an end, going back to Peru was out of question for our family. In December of 1945, we were deported to Japan. My uncle was not able to find work and died of cancer leaving eight children. None of the children was able to go to college. The older ones had to skip schooling, and go to work right away. Even today, the oldest son does not talk to the rest

of family because of the division within the family. He went to work in a factory at the age of 16, and I am told that he is generally bitter about life. They had much stress and tension in the family because of heir experience.

14. In conclusion, I must say I have ambivalent feelings sitting here telling about my personal story. My value system is shaped partly by Japanese cultures which view negatively about telling one's personal matter in public. We do not want to sound as though we are complaining, and asking for something.

15. Of course, now we know more about the history. I called my mother in Japan two weeks ago. I asked her, "Now knowing the true story, do you think it was fair that the uncle Shigezo died in despair?" She said, "it was not, but what can one do?" I pointed out that our youngest brother who has no memory of prison camp was compensated $20,000, and my mother did not receive anything. "Is it fair?" She said. "Well, life is not that simple. Whatever amount people think is fair is fine with me." Then she said "I will not be bitter even if I would not receive anything."

16. I am told there are some Peruvian Japanese who are demanding the full redress as the other American Japanese received. I agree with them, although I also agree with my family and cousins who all accepted being part of the settlement agreement. I do believe the Peruvian Japanese were just as wrongfully treated as the American Japanese, and some suffered a great deal. A sense of justice and fairness is one critical American ideal that my father admired, and I learned a lot from him, he was a very fair person. I wonder what he would think if he knew why we were taken from Peru.

17. I also want to pass the sentiments from my cousin, Michie Miyagi, in Japan, who recently said in a Christmas card of my father and her parents that they "worked so hard under very difficult conditions to build a life, and yet their fortune was instantly and completely wiped out. They received a great blow both economically and mentally. I of-ten think, if only we had not been sent to camp I cannot forgive it. We are justly entitled to receive a Presidential apology and due compensation."

18. Again I thank you for you patience and listening to my personal story. I do hope it adds to your understanding of this forgotten chapter of American history.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C., on January 6, 1999.

/s/Kazuo Matsubayashi
Kazuo Matsubayashi

**Declaration of Sadaharu Sakamoto**

I, Sadaharu Sakamoto, hereby declare the following:

1. The matters stated herein are based on personal knowledge, or upon information and belief. If called to testify, I could and would do so competently.

2. When I was 22 years old, I was abducted from Bolivia, where I had lived for nearly three years. I was living with my brother, with whom I operated a business. My brother, whose name was Jorge Yamane, passed away in Bolivia. Another brother of mine was also living in Bolivia at the time. I remember 140 to 150 other Japanese were living in La Paz, Bolivia.

3. I am 79 years old. I was born on October 29, 1921 in the Saitama Prefecture of Japan.

4. I am currently a citizen and resident of Japan. For reasons of privacy, I prefer not stating the location of my residence.

5. I wish to make the following statement in connection for the court hearing on the settlement of the class action lawsuit, Carmen Mochizuki, et al. v. United States of America (Case No. 894C).

6. I support the settlement. However, I do feel bad about it because I think we should receive the same amount, if not more, as everyone else imprisoned in the U.S. By explaining what happened to me, it will help the Court to understand why I have mixed feelings about the settlement agreement.

7. I had immigrated to Bolivia to join my brother who was operating an import, wholesale and retail business. I lived in Bolivia for over two and a half years. I was enjoying my life in Bolivia and considered it my home. Because Japanese in Bolivia were largely involved in the import business, the Bolivian government treated us well.

8. On April 13, 1943, I was returning home one evening from having coffee at a friend's house when I found two plainclothes police waiting for me. I was surprised. I knew the government had been arresting the Japanese who were company presidents, but since I wasn't one, I did not expect they would come after me. They told me to pack two suitcases, to go to the police station. I was taken to a nearby jail, where I joined 28 other men of Japanese ancestry, where we were imprisoned for 4 or 5 days. Many of the other man have already passed away. (I know that six of them are still alive and they told me they had applied for redress to the U.S. government.) We were not given a reason for our arrest. They just ordered us to come with them. No explanation was given. The police watched as we packed our belongings.

9. We were then taken to an airport in La Paz where we were herded onto DC3 airplanes marked with American symbols. The windows of the plane were boarded up and we were not told where we were being taken. We were guarded by armed U.S. military personnel who were Mexican Americans who spoke Spanish, but could not tell us why people were being arrested and transported.

10. We landed in Peru where we spent one night. We were then flown to the Panama Canal Zone where we were incarcerated for what seemed like two months.

11. During those two months, we were put into a camp behind barbed wire. We were forced to cut grass and bushes with machetes in tremendous heat. It was oppressive and unbearable. We were always being watched by guards who had their guns pointed at us. It was the most eerie and frightening experience of my life. I remember that the Germans cooked the food, and got to sleep in single beds, not bunks as we did.

12. From the Panama Canal Zone, we were put on a U.S. destroyer and shipped without explanation, along with wives and children from Peru, to a New Orleans port, via an U.S. military base in the Caribbean. In New Orleans, we were made to take our clothes off, and we were sprayed with what I know understand was DDT. The U.S. authorities confiscated my passport in New Orleans or before. From there, we were placed on trains and taken to a concentration camp in Kennedy, Texas.

13. I lived in Kennedy for three or four months. There were other Latin Americans of Japanese descent who had suffered similar experiences. We were all single men. We found out later that the man with families were sent to a concentration camp in Crystal City, Texas, where they joined other family members. Kennedy was also a place of oppressive heat.

14. From Kennedy, I was sent to a concentration camp in Santa Fe, New Mexico, where I stayed for just over one year, until the end of war. I remember it was very hot there. There were barracks with about 50 to 60 beds. The steel bed frames got very hot.

15. I was able to stay with an acquaintance in Seattle, Washington, until late November of 1945 when I went to Japan. I was never able to return to Bolivia to live.

16. Because of all this, I feel bad about not being paid the full redress. We have suffered so much, having been taken from our country, lost the business my brothers and I had worked hard to establish, and never able to return. I don't understand why we were taken.

17. However, I still support the settlement, since I understand that it is the best we can hope for. The reality of the matter is that we are aging rapidly and, having had many friends pass away already, I feel the need for a speedy resolution to this injustice.

I swear under the penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed on December 20, 1998 at Seta-

gaya District, Japan and translated to English in Los Angeles, California.

/S/Sadaharu Sakamoto

Sadaharu Sakamoto

Jan. 6, 1999

/s/Ayako Hagihara

Ayako Hagihara, translator

## DECLARATION OF ROSE A. NISHIMURA

**I, Rose Akiko Nishimura, declare:**

If called as a witness, I could and would testify as follows:

1. I am now a citizen of the United States. I was born in Lima, Peru. My parents had a successful business importing textiles and manufacturing dress shirts. My grandparents owned a department store in Callao, Peru and during World War II they were among the first Japanese Peruvians to be taken hostage. They were used in one of the exchanges for American civilians trapped in Asia and sent to Japanese controlled territories. We never got to see them again. I have always felt terrible about that.

2. After the first Japanese Peruvian hostages were placed on a U.S. Army transport and shipped to an unknown destination, some of the Japanese Peruvian men went into hiding, including our father, whenever a U.S. transport arrived in the harbor. The police came looking for him several times and after not finding him, they arrested my mother and placed her in jail to force my father out of hiding. Our oldest sister, who was 11 years old, went with her because she did not want our mother to be alone. When word of this reached my father, he gave himself up.

3. We were then put on a U.S. Army transport called Cuba. We were guarded by U.S. military personnel with rifles, machine guns and whips. I was only nine years old at the time. It was so scary. Passports were confiscated. The women and children were put in a small cabin. There were 6 of us: our mother and 5 children. Another family of 4 was placed in the same cabin. So many of us had to sleep on the floor. The men and the older boys, 13 years and older, were put

down below and were only allowed to go on deck twice a day for 10 minutes. During those 10 minutes, the women and children had to remain in their cabins. It caused me so much anxiety that our families were separated and were unable to see each other during the entire trip, which took 21 days.

4. When we arrived in New Orleans, the women and children were led off the ship first and marched to a warehouse. We were ordered to strip and stand in line naked. We were then sprayed in mass with insecticide. I was humilliated having to take my clothes off in front of boys my age. I also realize how awful this must have been for my mother, whose modesty was violated by her having to be naked in front of strangers, including boys. The men and older boys went through the same procedure separately.

5. We were put on a train and for the first time the families were finally reunited. It took two days for us to arrive at Crystal City, Texas. One of my sisters believed that we were going to be killed at the end of the train ride.

6. They put us in a camp with barbed wire fences and we were guarded by U.S. soldiers with machine guns in guard towers. It was scary because we were told if we got near the fences we would be shot. They put 8 of us in 2 rooms of a 3 room barrack.

7. In the camp our parents sent us to Japanese school because there were only Japanese and English schools. There were no Spanish schools, and English was rarely used in Peru, in those days.

8. After 2½ years in Crystal City there were reports that the camp was going to be closed. We wanted to return to Peru but the Peruvian government would not allow us. The only way the U.S. would allow us to get out of the prison camp was to be paroled as "illegal aliens" to Seabrook Farms in N.J. There my father worked packaging frozen foods. But the amount he received was not enough to provide for our family of six and my mother was pregnant. So my oldest brother and sister, instead of going to school, had to go to work. We had difficulty communicating with the other workers because we did not speak English.

9. After working 2½ years in Seabrook, waiting for the chance to return to our homeland in Peru, my father finally gave up all hope of returning there. So we moved to Chicago in March, 1949.

10. Three of my brothers were drafted into and served in the U.S. Army, even though they were considered "illegal aliens." In 1953, my oldest brother, Art Shibayama, while serving in Europe, his warrant officer tried to get him his United States citizenship. He was denied because the government claimed he had not entered the United States legally. Upon returning to the U.S., he was faced with deportation proceedings. Art was told by INS officials that he should go to Canada and reenter in order to get legal entry. He followed those instructions, and as a result, he got legal residency, but not retroactive, so he was denied redress. Ironically, one of my sisters did not want to take the chance of leaving the U.S. and not be able to get back in. She ended up getting residency, and, under the 1988 law, she received redress.

11. We did not want to come to this land. We were forcibly brought here by the United States government on a United States military transport and put in a barbed wire enclosed camp administered by the Immigration & Naturalization Service of the United States. So how can it be said we were illegal aliens?

12. Though the amount proposed by the settlement is not fair, I support it because, hopefully, at least some of the older persons will receive a little recognition of the injustice that had been inflicted upon us. But I don't understand why we are receiving less than the Japanese Americans. We suffered equally as they did. Indeed, when you think about it, perhaps even more because we were snatched from our own country and brought to a strange land whose language we did not know. Deciding whether to accept the settlement has been so difficult that it divided our family: while I and my sister chose to accept it, my brothers have chosen not to. However, we support each others' decisions.

13. I am very worried about the funds running out so that many or all of us Japanese Latin Americans may not even receive the redress payment. I was disturbed to hear that the government had not invested the money as the law required. I hope the U.S. government will correct its mistake.

14. I find it very difficult to talk about this experience. When the lawyers asked me to come to Washington to testify, I had to decline because I knew I would break down and cry, and be unable to tell the story. I hope the judge will forgive my absence.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Saratoga, California on January 6, 1999.

/s/Rose Akiko Nishimura
Rose Akiko Nishimura

### Declaration of Grace Shimizu

I, Grace Shimizu, declare that if called to testify to the following, I could and would do so competently, as follows:

1. I am the daughter of a Japanese Peruvian internee, Susumu Shimizu, who at age 92 years is one of the oldest survivors of the US-initiated program of forcible deportation of civilians from their homes in Latin America and incarceration in internment camps in Panama and the United States for the purpose of hostage exchange during World War II.

2. I am also the Coordinator of the Japanese Peruvian Oral History Project, which is a non-profit organization founded by internees and their families to preserve family histories and to educate the public about this little known chapter with the hopes that such violations of civil and human rights not be repeated by any government during times of peace or war. Approximately 80% of the 2,264 Japanese Latin Americans who were forcibly deported from their home countries in Latin America and incarcerated in the United States during WWII were Japanese Peruvians.

3. Since 1991, our Project has conducted and collected over 50 oral history interviews in the United States, Japan, Okinawa and Peru. We have been able to not only preserve our family experiences, but also to

document first hand accounts which have been able to verify and elaborate on what little has been researched about this episode. Due to the courage and generosity of these internees, we continue to learn more about the lengths to which governments went to use civilians as human trade during time of war, how lives were changed forever, and how years later the effects of the traumatic experience are still being felt and passed onto later generations. Similar to the Japanese American experience, we are also gaining insight into how the struggle for truth and justice has begun a healing process for our families. We are bringing to light and giving a human face to a part of history, which might have been suppressed by the U.S. government, had it not been for the victims themselves speaking out.

4. After the Settlement Agreement was signed, I traveled to six cities in three countries in about eighteen days, and discussed the provisions of the Settlement Agreement with over 100 Japanese Latin American internees and their families. I would like to share their responses, and how difficult it was for many of them to make the decision whether to accept or reject the *Mochizuki* Settlement Agreement.

5. For many internees, it meant remembering personal and family experiences, opening up old wounds, and sometimes reliving the terror, fear, instability and poverty. One internee recalled the terrible conditions in the U.S. military camp in Panama where he was forced to perform hard labor in intensely hot weather in violation of the Geneva Convention and wiping up the blood of another internee who had been shot by guards. Another internee, who was deported to Japan after the end of the war, recounted facing starvation conditions and pulling weeds for her children to eat so that there would be something in their stomachs and later having to bury her youngest child whom had died of malnutrition.

6. For some internees it was the first time in decades to confront their past. And for others they may not have ever verbalized their feelings or shared their memories, even with their own family members. For some it meant finding the courage to make themselves visible to the governments which had violated them and to communities where they had experienced prejudice, discrimination and violence in the past. For others they grappled with the realization that they have been victims of war crimes.

7. For many internees, it meant coming to terms with one's own hopes and expectations and the reality of one's treatment in the political and legal system. And some also expressed the weight of responsibility in realizing that any decision affected not only one's self or family, but also has consequences for other internees and their families and could set a precedent for redress for other people around the world.

8. Among Japanese Latin American internees and their families, there are mixed emotions and reactions regarding the Settlement Agreement. No internee expressed unqualified satisfaction with the Settlement nor characterized it as a "triumph for justice." Most felt that it is for each internee to decide from his/her own heart and that such decisions would be respected and supported.

9. The majority of internees I spoke with voiced that the Settlement was a "bittersweet victory" and "the best we could get." Some believed the apology is sincere and a major achievement. Some had no or little expectation of redress and did not believe that the same government that abused them would ever acknowledge or apologize. Thus, some considered that getting the U.S. government to apologize, let alone the promise of possible compensation payments, was a great surprise and achievement. One said she felt that honor and dignity has been restored.

10. Others felt that after a hard struggle this agreement was the best this U.S. government would ever agree to. They underscored the significance of the apology and considered the usage of particular words to be significant: "profound regret" that the U.S. government denied "fundamental liberties" and committed "a grave injustice" due to "racial prejudice and wartime hysteria." They weighed the apology and promise of $5,000 compensation payments against an uncertain lawsuit, which could take years to resolve and in the meantime many internees,

may pass away. Many of these internees believed the repeated assertions by U.S. government officials that there would be sufficient funding in the redress fund for all Japanese Latin Americans.

11. A minority of the internees, particularly living today in Peru, with whom I spoke to about the Settlement Agreement felt it was an insulting gesture and does not restore any honor or dignity in memory of those passed away or those still alive. These internees recognized that the Settlement does not include Japanese Latin Americans under the Civil Liberties Act of 1988 and does not give them equal treatment with Japanese Americans.

12. Some criticized the content of the apology letter because it does not make any reference to "Japanese" or "Latin America," is perfunctory and generic in tone, and does not refer to the scope and severity of human rights violations committed. Others expressed the belief that the apology is insincere because the Settlement did not give enough time for internees living throughout the world to be notified and then apply for redress. Others objected to the lack of guarantee of compensation to all the internees. Some felt insulted that Japanese Latin Americans must wait until all Japanese Americans have been compensated and would only be granted what they viewed as "left-over" monies.

13. Some also stated that it is unfair that redress is denied to approximately 7 children born U.S. citizens in the internment camp after June 30, 1946 and the many internees who died before August 10, 1988. Many also believe that given all the problems and concerns with the provisions of the Settlement, as expressed above, this is a dangerous precedent for redress of clear human rights violations committed by governments.

14. Japanese Latin American internees are now being informed that there will very likely be insufficient redress funds for both Japanese Americans and Japanese Latin Americans due to the government's failure to invest the redress funds as required under the Civil Liberties Act of 1988. Some internees have questioned why the Office of Redress Administration had made repeated assurances at community meetings that there would be sufficient funds, and then recently announced the likelihood that there will be insufficient funds to pay any of the Japanese Latin American internees. Some internees do not understand how the U.S. government could have failed to invest the redress funds when it was required by law. Some internees continue to assert belief in the President's promise to help secure additional funding and have faith in the President and U.S. Congress. Other internees have expressed disgust and are cynical about the U.S. government's redress efforts.

15. In conclusion, the majority of internees have chosen to accept the *Mochizuki* Settlement, based on the initial assurances of sufficient redress funds and the belief that the U.S. president and Congress would secure additional funding if necessary. Therefore, many internees feel it is better to compromise and get something as soon as possible rather than to get nothing. Most internees expressed their intention to accept the Settlement despite concerns. Those internees who believe that the risk of receiving nothing is better than accepting an unjust Agreement have largely "opted out." All internees expressed strong support for continued efforts which would ensure that all Japanese Latin American internees receive equal treatment with Japanese Americans, including redress payments of $20,000 as Japanese Americans have been granted.

I swear under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Washington, D.C. on January 7, 1999.

/s/Grace Shimizu
Grace Shimizu