**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BINYAM MOHAMED; ABOU ELKASSIM
BRITEL; AHMED AGIZA; MOHAMED
FARAG AHMAD BASHMILAH; BISHER
AL-RAWI,
　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

JEPPESEN DATAPLAN, INC.,
　　　　　*Defendant-Appellee,*

UNITED STATES OF AMERICA,
　　　　　*Intervenor-Appellee.*

No. 08-15693

D.C. No.
5:07-CV-02798-JW

OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, Presiding

Argued and Submitted En Banc
December 15, 2009—San Francisco, California

Filed September 8, 2010

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
William C. Canby, Michael Daly Hawkins,
Sidney R. Thomas, Raymond C. Fisher,
Richard A. Paez, Richard C. Tallman,
Johnnie B. Rawlinson, Consuelo M. Callahan and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Bea;
Dissent by Judge Hawkins

13515

## COUNSEL

Steven M. Watt, Ben Wizner (argued), Jameel Jaffer and Steven R. Shapiro, American Civil Liberties Union Foundation, New York, New York; Ann Brick and Julia Harumi Mass, American Civil Liberties Union Foundation of Northern California, San Francisco, California; Paul Hoffman, Schonbrun

DeSimone Seplow Harris & Hoffman LLP, Venice, California; Hope Metcalf, National Litigation Project, Allard K. Lowenstein International Human Rights Clinic, Yale Law School, New Haven, Connecticut, for the plaintiffs-appellants.

Clive Stafford-Smith and Zachary KatzNelson, Reprieve, London, England, for plaintiff-appellant Binyam Mohamed.

Margaret L. Satterthwaite and Amna Akbar, International Human Rights Clinic, Washington Square Legal Services, Inc., New York, New York, for plaintiff-appellant Mohamed Farag Ahmad Bashmilah.

Daniel P. Collins (argued), Paul J. Watford, Mark R. Yohalem and Henry Weissmann, Munger, Tolles & Olson LLP, Los Angeles, California, for defendant-appellee Jeppesen Dataplan, Inc.

Ian Heath Gershengorn, Michael F. Hertz, Joseph P. Russoniello, Douglas N. Letter (argued), Sharon Swingle and Michael P. Abate, United States Department of Justice, Washington, D.C., for intervenor-appellee United States of America.

Gary Bostwick and Jean-Paul Jassy, Bostwick & Jassy LLP, Los Angeles, California, for amici curiae Professors William G. Weaver and Robert M. Pallitto.

Barbara Moses and David J. Stankiewicz, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, New York; Aziz Huq and Jonathan Hafetz, Brennan Center for Justice at NYU School of Law, New York, New York, for amici curiae former United States diplomats.

Wiliam J. Aceves, California Western School of Law, San Diego, California; Gerald Staberock and Carlos Lopez, International Commission of Jurists, Geneva, Switzerland; Carla Ferstman, Lorna McGregor and Lucy Moxham, REDRESS,

London, United Kingdom; Denna R. Hurwitz, Human Rights Program, University of Virginia School of Law, Charlottesville, Virginia, for amici curiae REDRESS and the International Commission of Jurists.

Stephen I. Vladeck, American University Washington College of Law, Washington, D.C.; Natalie L. Bridgeman, Law Offices of Natalie L. Bridgeman, San Francisco, California, for amici curiae professors of constitutional law, federal jurisdiction and foreign relations law.

Andrew G. McBride, Thomas R. McCarthy and Stephen J. Obermeier, Wiley Rein LLP, Washington, D.C., for amicus curiae Foundation for the Defense of Democracies.

Daniel J. Popeo and Richard A. Samp, Washington Legal Foundation, Washington, D.C., for amici curiae Washington Legal Foundation and Allied Educational Foundation.

Richard R. Wiebe, Law Office of Richard R. Wiebe, San Francisco, California; Cindy A. Cohn, Lee Tien, Kurt Opsahl, Kevin S. Bankston, Corynne Mcherry and James S. Tyre, Electronic Frontier Foundation, San Francisco, California, for amicus curiae Electronic Frontier Foundation.

James M. Ringer, Clifford Chance US LLP, New York, New York, for amici curiae Commonwealth Lawyers Association and JUSTICE.

---

## OPINION

FISHER, Circuit Judge:

This case requires us to address the difficult balance the state secrets doctrine strikes between fundamental principles of our liberty, including justice, transparency, accountability

and national security. Although as judges we strive to honor *all* of these principles, there are times when exceptional circumstances create an irreconcilable conflict between them. On those rare occasions, we are bound to follow the Supreme Court's admonition that "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake." *United States v. Reynolds*, 345 U.S. 1, 11 (1953). After much deliberation, we reluctantly conclude this is such a case, and the plaintiffs' action must be dismissed. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

We begin with the factual and procedural history relevant to this appeal. In doing so, we largely draw upon the three-judge panel's language in *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949-52 (9th Cir.) (*Jeppesen I*), *rehearing en banc granted*, 586 F.3d 1108 (9th Cir. 2009). We emphasize that this factual background is based only on the *allegations* of plaintiffs' complaint, which at this stage in the litigation we construe "in the light most favorable to the plaintiff[s], taking all [their] allegations as true and drawing all reasonable inferences from the complaint in [their] favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). Whether plaintiffs' allegations are in fact true has not been decided in this litigation, and, given the sensitive nature of the allegations, nothing we say in this opinion should be understood otherwise.

### A. Factual Background

#### 1. The Extraordinary Rendition Program

Plaintiffs allege that the Central Intelligence Agency ("CIA"), working in concert with other government agencies and officials of foreign governments, operated an extraordinary rendition program to gather intelligence by apprehending

foreign nationals suspected of involvement in terrorist activities and transferring them in secret to foreign countries for detention and interrogation by United States or foreign officials. According to plaintiffs, this program has allowed agents of the U.S. government "to employ interrogation methods that would [otherwise have been] prohibited under federal or international law." Relying on documents in the public domain, plaintiffs, all foreign nationals, claim they were each processed through the extraordinary rendition program. They also make the following individual allegations.

Plaintiff Ahmed Agiza, an Egyptian national who had been seeking asylum in Sweden, was captured by Swedish authorities, allegedly transferred to American custody and flown to Egypt. In Egypt, he claims he was held for five weeks "in a squalid, windowless, and frigid cell," where he was "severely and repeatedly beaten" and subjected to electric shock through electrodes attached to his ear lobes, nipples and genitals. Agiza was held in detention for two and a half years, after which he was given a six-hour trial before a military court, convicted and sentenced to 15 years in Egyptian prison. According to plaintiffs, "[v]irtually every aspect of Agiza's rendition, including his torture in Egypt, has been publicly acknowledged by the Swedish government."

Plaintiff Abou Elkassim Britel, a 40-year-old Italian citizen of Moroccan origin, was arrested and detained in Pakistan on immigration charges. After several months in Pakistani detention, Britel was allegedly transferred to the custody of American officials. These officials dressed Britel in a diaper and a torn t-shirt and shackled and blindfolded him for a flight to Morocco. Once in Morocco, he says he was detained incommunicado by Moroccan security services at the Temara prison, where he was beaten, deprived of sleep and food and threatened with sexual torture, including sodomy with a bottle and castration. After being released and re-detained, Britel says he was coerced into signing a false confession, convicted

of terrorism-related charges and sentenced to 15 years in a Moroccan prison.

Plaintiff Binyam Mohamed, a 28-year-old Ethiopian citizen and legal resident of the United Kingdom, was arrested in Pakistan on immigration charges. Mohamed was allegedly flown to Morocco under conditions similar to those described above, where he claims he was transferred to the custody of Moroccan security agents. These Moroccan authorities allegedly subjected Mohamed to "severe physical and psychological torture," including routinely beating him and breaking his bones. He says they cut him with a scalpel all over his body, including on his penis, and poured "hot stinging liquid" into the open wounds. He was blindfolded and handcuffed while being made "to listen to extremely loud music day and night." After 18 months in Moroccan custody, Mohamed was allegedly transferred back to American custody and flown to Afghanistan. He claims he was detained there in a CIA "dark prison" where he was kept in "near permanent darkness" and subjected to loud noise, such as the recorded screams of women and children, 24 hours a day. Mohamed was fed sparingly and irregularly and in four months he lost between 40 and 60 pounds. Eventually, Mohamed was transferred to the U.S. military prison at Guantanamo Bay, Cuba, where he remained for nearly five years. He was released and returned to the United Kingdom during the pendency of this appeal.[1]

Plaintiff Bisher al-Rawi, a 39-year-old Iraqi citizen and legal resident of the United Kingdom, was arrested in Gambia while traveling on legitimate business. Like the other plaintiffs, al-Rawi claims he was put in a diaper and shackles and placed on an airplane, where he was flown to Afghanistan. He

---

[1]Mohamed's allegations have been discussed in other litigation in both the United States and the United Kingdom. *See Mohammed v. Obama*, 689 F. Supp. 2d 38 (D.D.C. 2009); *R (Mohamed) v. Secretary of State for Foreign and Commonwealth Affairs*, [2010] EWCA (Civ) 65 (decision of the United Kingdom Court of Appeal).

says he was detained in the same "dark prison" as Mohamed and loud noises were played 24 hours per day to deprive him of sleep. Al-Rawi alleges he was eventually transferred to Bagram Air Base, where he was "subjected to humiliation, degradation, and physical and psychological torture by U.S. officials," including being beaten, deprived of sleep and threatened with death. Al-Rawi was eventually transferred to Guantanamo; in preparation for the flight, he says he was "shackled and handcuffed in excruciating pain" as a result of his beatings. Al-Rawi was eventually released from Guantanamo and returned to the United Kingdom.

Plaintiff Farag Ahmad Bashmilah, a 38-year-old Yemeni citizen, says he was apprehended by agents of the Jordanian government while he was visiting Jordan to assist his ailing mother. After a brief detention during which he was "subject[ed] to severe physical and psychological abuse," Bashmilah claims he was given over to agents of the U.S. government, who flew him to Afghanistan in similar fashion as the other plaintiffs. Once in Afghanistan, Bashmilah says he was placed in solitary confinement, in 24-hour darkness, where he was deprived of sleep and shackled in painful positions. He was subsequently moved to another cell where he was subjected to 24-hour light and loud noise. Depressed by his conditions, Bashmilah attempted suicide three times. Later, Bashmilah claims he was transferred by airplane to an unknown CIA "black site" prison, where he "suffered sensory manipulation through constant exposure to white noise, alternating with deafeningly loud music" and 24-hour light. Bashmilah alleges he was transferred once more to Yemen, where he was tried and convicted of a trivial crime, sentenced to time served abroad and released.

### 2. Jeppesen's Alleged Involvement in the Rendition Program

Plaintiffs contend that publicly available information establishes that defendant Jeppesen Dataplan, Inc., a U.S. corpora-

tion, provided flight planning and logistical support services to the aircraft and crew on all of the flights transporting each of the five plaintiffs among the various locations where they were detained and allegedly subjected to torture. The complaint asserts "Jeppesen played an integral role in the forced" abductions and detentions and "provided direct and substantial services to the United States for its so-called 'extraordinary rendition' program," thereby "enabling the clandestine and forcible transportation of terrorism suspects to secret overseas detention facilities." It also alleges that Jeppesen provided this assistance with actual or constructive "knowledge of the objectives of the rendition program," including knowledge that the plaintiffs "would be subjected to forced disappearance, detention, and torture" by U.S. and foreign government officials.[2]

## B.   Summary of the Claims

Plaintiffs brought suit against Jeppesen under the Alien Tort Statute, 28 U.S.C. § 1350, alleging seven theories of liability marshaled under two claims, one for "forced disappearance" and another for "torture and other cruel, inhuman or degrading treatment." First Am. Compl. ¶¶ 253-66.

With respect to the forced disappearance claim, plaintiffs assert four theories of liability: (1) direct liability for active participation, (2) conspiracy with agents of the United States, (3) aiding and abetting agents of the United States and (4) direct liability "because [Jeppesen] demonstrated a reckless disregard as to whether Plaintiffs would be subjected to forced disappearance through its participation in the extraordinary rendition program and specifically its provision of flight and logistical support services to aircraft and crew that it knew or reasonably should have known would be used to

---

[2]Among the materials plaintiffs filed in opposition to the government's motion to dismiss is a former Jeppesen employee's declaration, which plaintiffs assert demonstrates this knowledge. *See* Dissent at 13561 n.3.

transport them to secret detention and interrogation." *Id.* ¶¶ 254-57.

On the torture and degrading treatment claim, plaintiffs assert three theories of liability: (1) conspiracy with agents of the U.S. in plaintiffs' torture and degrading treatment, (2) aiding and abetting agents of the U.S. in subjecting plaintiffs to torture and degrading treatment and (3) direct liability "because [Jeppesen] demonstrated a reckless disregard as to whether Plaintiffs would be subjected to torture or other cruel, inhuman, or degrading treatment by providing flight and logistical support to aircraft and crew it knew or reasonably should have known would be used in the extraordinary rendition program to transport them to detention and interrogation." *Id.* ¶¶ 262-64.

Regarding Jeppesen's alleged actual or constructive knowledge that its services were being used to facilitate "forced disappearance," plaintiffs allege that Jeppesen "knew or reasonably should have known that the flights involved the transportation of terror suspects pursuant to the extraordinary rendition program," that their "knowledge of the objectives of the rendition program" may be inferred from the fact that they allegedly "falsified flight plans submitted to European air traffic control authorities to avoid public scrutiny of CIA flights" and that a Jeppesen employee admitted actual knowledge that the company was performing extraordinary rendition flights for the U.S. government. *Id.* ¶¶ 16, 17, 56. Similarly, plaintiffs allege that Jeppesen knew or should have known that that torture would result because it should have known it was carrying terror suspects for the CIA and that "the governments of the destination countries routinely subject detainees to torture and other forms of cruel, inhuman, or degrading treatment." *Id.* ¶¶ 17, 56. They also rely on U.S. State Department country reports describing torture as "routine" in some of the countries to which plaintiffs were allegedly rendered, and note that Jeppesen claims on its website that it "monitors

political and security situations" as part of its trip planning services. *Id.* ¶¶ 14, 42, 56.

## C.  Procedural History

Before Jeppesen answered the complaint, the United States moved to intervene and to dismiss plaintiffs' complaint under the state secrets doctrine. The then-Director of the CIA, General Michael Hayden, filed two declarations in support of the motion to dismiss, one classified, the other redacted and unclassified. The public declaration states that "[d]isclosure of the information covered by this privilege assertion reasonably could be expected to cause serious — and in some instances, exceptionally grave — damage to the national security of the United States and, therefore, the information should be excluded from any use in this case." It further asserts that "because highly classified information is central to the allegations and issues in this case, the risk is great that further litigation will lead to disclosures harmful to U.S. national security and, accordingly, this case should be dismissed."

The district court granted the motions to intervene and dismiss and entered judgment in favor of Jeppesen, stating that "at the core of Plaintiffs' case against Defendant Jeppesen are 'allegations' of covert U.S. military or CIA operations in foreign countries against foreign nationals — clearly a subject matter which is a state secret." Plaintiffs appealed. A three-judge panel of this court reversed and remanded, holding that the government had failed to establish a basis for dismissal under the state secrets doctrine but permitting the government to reassert the doctrine at subsequent stages of the litigation. *Jeppesen I*, 579 F.3d at 953, 961-62. We took the case en banc to resolve questions of exceptional importance regarding the scope and application of the state secrets doctrine. *See* Fed. R. App. P. 35(a)(2).

The government maintains its assertion of privilege on appeal, continuing to rely on General Hayden's two declara-

tions. While the appeal was pending Barack Obama succeeded George W. Bush as President of the United States. On September 23, 2009, the Obama administration announced new policies for invoking the state secrets privilege, effective October 1, 2009, in a memorandum from the Attorney General. *See* Memorandum from the Attorney Gen. to the Heads of Executive Dep'ts and Agencies on Policies and Procedures Governing Invocation of the State Secrets Privilege (Sept. 23, 2009) ("Holder Memo"), http://www.justice.gov/opa/documents/state-secret-privileges.pdf. The government certified both in its briefs and at oral argument before the en banc court that officials at the "highest levels of the Department of Justice" of the new administration had reviewed the assertion of privilege in this case and determined that it was appropriate under the newly announced policies. *See* Redacted, Unclassified Br. for U.S. on Reh'g *En Banc* ("U.S. Br.") 3.

## II. Standard of Review

We review de novo the interpretation and application of the state secrets doctrine and review for clear error the district court's underlying factual findings. *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007).

## III. The State Secrets Doctrine

[1] The Supreme Court has long recognized that in exceptional circumstances courts must act in the interest of the country's national security to prevent disclosure of state secrets, even to the point of dismissing a case entirely. *See Totten v. United States*, 92 U.S. 105, 107 (1876). The contemporary state secrets doctrine encompasses two applications of this principle. One completely bars adjudication of claims premised on state secrets (the "*Totten* bar"); the other is an evidentiary privilege ("the *Reynolds* privilege") that excludes privileged evidence from the case and *may* result in dismissal of the claims.[3] *See United States v. Reynolds*, 345 U.S. 1

---

[3]Were this a *criminal* case, the state secrets doctrine would apply more narrowly. *See El-Masri v. United States*, 479 F.3d 296, 313 n.7 (4th Cir.

(1953). We first address the nature of these applications and then apply them to the facts of this case.

### A.    The *Totten* Bar

In 1876 the Supreme Court stated "as a *general principle*[ ] that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential." *Totten*, 92 U.S. at 107 (emphasis added). The Court again invoked the principle in 1953, citing *Totten* for the proposition that "where the very subject matter of the action" is "a matter of state secret," an action may be "dismissed on the pleadings without ever reaching the question of evidence" because it is "so obvious that the action should never prevail over the privilege." *Reynolds*, 345 U.S. at 11 n.26. This application of *Totten*'s general principle — which we refer to as the *Totten* bar — is "designed not merely to defeat the asserted claims, but to preclude judicial inquiry" entirely. *Tenet v. Doe*, 544 U.S. 1, 7 n.4 (2005).

The Court first applied this bar in *Totten* itself, where the estate of a Civil War spy sued the United States for breaching an alleged agreement to compensate the spy for his wartime espionage services. Setting forth the "general principle" quoted above, the Court held that the action was barred because it was premised on the existence of a "contract for secret services with the government," which was "a fact not to be disclosed." *Totten*, 92 U.S. at 107.

A century later, the Court applied the *Totten* bar in *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139, 146-47 (1981). There, the plaintiffs sued under

2007) ("[T]he Executive's authority to protect [state secrets] is much broader in civil matters than in criminal prosecutions."); *see also Reynolds*, 345 U.S. at 12.

the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, to compel the Navy to prepare an environmental impact statement regarding a military facility where the Navy allegedly proposed to store nuclear weapons. The Court held that the allegations were "beyond judicial scrutiny" because, "[d]ue to national security reasons, . . . the Navy can neither admit nor deny that it proposes to store nuclear weapons at [the facility]." *Id.* (citing *Totten*, 92 U.S. at 107).

The Court more recently reaffirmed and explained the *Totten* bar in a case involving two former Cold War spies who accused the CIA of reneging on a commitment to provide financial support in exchange for their espionage services. Relying on "*Totten*'s core concern" of "preventing the existence of the plaintiffs' relationship with the Government from being revealed," the Court held that the action was, like *Totten* and *Weinberger*, incapable of judicial review. *Tenet*, 544 U.S. at 8-10.[4]

**[2]** Plaintiffs contend that the *Totten* bar applies *only* to a narrow category of cases they say are not implicated here, namely claims premised on a plaintiff's espionage relationship with the government. We disagree. We read the Court's discussion of *Totten* in *Reynolds* to mean that the *Totten* bar applies to cases in which "the very subject matter of the action" is "a matter of state secret." *Reynolds*, 345 U.S. at 11 n.26. "[A] contract to perform espionage" is only an example. *Id.* This conclusion is confirmed by *Weinberger*, which relied on the *Totten* bar to hold that a case involving nuclear weapons secrets, and having nothing to do with espionage contracts, was "beyond judicial scrutiny." *See Weinberger*, 454

---

[4]*Tenet* also made clear that application of the *Totten* bar does not require a formal assertion of the state secrets privilege by the government that meets the procedural requirements explained in *Reynolds* and discussed below. *See Tenet*, 544 U.S. at 8-9 (applying the *Totten* bar); *Doe v. Tenet*, 329 F.3d 1135, 1151-52 (9th Cir. 2003) (underlying appellate decision noting that no formal assertion had yet been filed).

U.S. at 146-47; *see also Tenet*, 544 U.S. at 9 (characterizing *Weinberger* as a case applying the *Totten* bar). Thus, although the claims in both *Totten* and *Tenet* were premised on the existence of espionage agreements, and even though the plaintiffs in both *Totten* and *Tenet* were themselves parties to the espionage agreements, the *Totten* bar rests on a general principle that extends beyond that specific context. We therefore reject plaintiffs' unduly narrow view of the *Totten* bar and reaffirm our holding in *Al-Haramain* that the bar "has evolved into the principle that where the very subject matter of a lawsuit is a matter of state secret, the action must be dismissed without reaching the question of evidence." *Al-Haramain*, 507 F.3d at 1197. As we explain below, the *Totten* bar is a narrow rule, but it is not as narrow as plaintiffs contend.

We also disagree with plaintiffs' related contention that the *Totten* bar cannot apply unless the *plaintiff* is a party to a secret agreement with the government. The environmental groups and individuals who were the plaintiffs in *Weinberger* were not parties to agreements with the United States, secret or otherwise. The purpose of the bar, moreover, is to prevent the revelation of state secrets harmful to national security, a concern no less pressing when the plaintiffs are strangers to the espionage agreement that their litigation threatens to reveal. Thus, even if plaintiffs were correct that the *Totten* bar is limited to cases premised on espionage agreements with the government, we would reject their contention that the bar is necessarily limited to cases in which the plaintiffs are themselves parties to those agreements.

## B. The *Reynolds* Privilege

**[3]** In addition to the *Totten* bar, the state secrets doctrine encompasses a "privilege against revealing military [or state] secrets, a privilege which is well established in the law of evidence." *Reynolds*, 345 U.S. at 6-7.[5] A successful assertion of

---

[5]The two applications of the doctrine remain distinct; *Reynolds* "in no way signaled [a] retreat from *Totten*'s broader holding." *Tenet*, 544 U.S. at 9.

privilege under *Reynolds* will remove the privileged evidence from the litigation. Unlike the *Totten* bar, a valid claim of privilege under *Reynolds* does not automatically require dismissal of the case. In some instances, however, the assertion of privilege will require dismissal because it will become apparent during the *Reynolds* analysis that the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets.

*Reynolds* involved a military aircraft carrying secret electronic equipment. *Id.* at 3. After the plane crashed, the estates of three civilian observers killed in the accident brought tort claims against the government. In discovery, plaintiffs sought production of the Air Force's official accident investigation report and the statements of three surviving crew members. The Air Force refused to produce the materials, citing the need to protect national security and military secrets. *Id.* at 4-5. The district court ordered the government to produce the documents in camera so the court could determine whether they contained privileged material. When the government refused, the court sanctioned the government by establishing the facts on the issue of negligence in plaintiffs' favor. *Id.* at 5.

The Supreme Court reversed and sustained the government's claim of privilege because "there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission." *Id.* at 10. The Court also provided guidance on how claims of privilege should be analyzed and held that, under the circumstances, the district court should have sustained the privilege without even requiring the government to produce the report for in camera review. *Id.* at 10-11. The Court did not, however, dismiss the case outright. Rather, given that the secret electronic equipment was unrelated to the cause of the accident, it remanded to the district court, affording plaintiffs the opportunity to try to establish

their claims without the privileged accident report and witness statements. *Id.* at 11.

Analyzing claims under the *Reynolds* privilege involves three steps:

> First, we must "ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied." Second, we must make an independent determination whether the information is privileged. . . . Finally, "the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim."

*Al-Haramain*, 507 F.3d at 1202 (citation omitted) (quoting *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007)). We discuss these steps in turn.

### 1. *Procedural Requirements*

*a. Assertion of the privilege.* "The privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *Reynolds*, 345 U.S. at 7 (footnotes omitted). The privilege "is not to be lightly invoked." *Id*. This is especially true when, as in this case, the government seeks not merely to preclude the production of particular items of evidence (as in *Reynolds*) but to obtain dismissal of the entire action.

[4] To ensure that the privilege is invoked no more often or extensively than necessary, *Reynolds* held that "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Id.* at 7-8 (footnote omitted). This certification is fundamental to the government's claim of privilege. As we have observed in a different context, the decision to invoke the privilege must "be a serious, considered judgment, not simply an administrative formality."

*United States v. W.R. Grace*, 526 F.3d 499, 507-08 (9th Cir. 2008) (en banc). The formal claim must reflect the certifying official's *personal* judgment; responsibility for this task may not be delegated to lesser-ranked officials. The claim also must be presented in sufficient detail for the court to make an independent determination of the validity of the claim of privilege and the scope of the evidence subject to the privilege.

In the present case, General Michael Hayden, then-Director of the CIA, asserted the initial, formal claim of privilege and submitted detailed public and classified declarations. We were informed at oral argument that the current Attorney General, Eric Holder, has also reviewed and approved the ongoing claim of privilege. Although *Reynolds* does not require review and approval by the Attorney General when a different agency head has control of the matter, such additional review by the executive branch's chief lawyer is appropriate and to be encouraged.

**[5]** *b. Timing.* Plaintiffs contend that the government's assertion of privilege was premature, urging that the *Reynolds* privilege cannot be raised before an obligation to produce specific evidence subject to a claim of privilege has actually arisen. We disagree. The privilege may be asserted at any time, even at the pleading stage.

The privilege indisputably may be raised with respect to discovery requests seeking information the government contends is privileged. Courts have repeatedly sustained claims of privilege under those circumstances. *See, e.g.*, *Reynolds*, 345 U.S. at 3 (document production requests); *Kasza v. Browner*, 133 F.3d 1159, 1170 (9th Cir. 1998) (various discovery requests); *Halkin v. Helms*, 690 F.2d 977, 985-87 (D.C. Cir. 1982) (interrogatories, document production requests and oral depositions). In addition, the government may raise the privilege to prevent the disclosure of privileged information in a responsive pleading, as it did in *Ellsberg v. Mitchell*, 709 F.2d 51, 54 & n.6 (D.C. Cir. 1983), and *Black v. United States*, 62

F.3d 1115, 1117-19 (8th Cir. 1995). *See Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) (explaining that the contents of an answer may be evidentiary); *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980) (holding that admissions in opposing parties' pleadings are admissible as evidence).

We also conclude that the government may assert a *Reynolds* privilege claim prospectively, even at the pleading stage, rather than waiting for an evidentiary dispute to arise during discovery or trial. *See, e.g.*, *El-Masri*, 479 F.3d at 308 ("[D]ismissal at the pleading stage is appropriate if state secrets are so central to a proceeding that it cannot be litigated without threatening their disclosure."); *Black*, 62 F.3d at 1117-19 (dismissing the action at the pleading stage based on the government's assertion of privilege over certain categories of information concerning U.S. intelligence operations); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc) (per curiam); *see also Al-Haramain*, 507 F.3d at 1201 (recognizing that *Reynolds* may result in dismissal even without "await[ing] preliminary discovery"). In some cases, the court may be able to determine with certainty from the nature of the allegations and the government's declarations in support of its claim of secrecy that litigation must be limited or cut off in order to protect state secrets, even before any discovery or evidentiary requests have been made. In such cases, waiting for specific evidentiary disputes to arise would be both unnecessary and potentially dangerous. *See Sterling v. Tenet*, 416 F.3d 338, 344 (4th Cir. 2005) ("Courts are not required to play with fire and chance further disclosure — inadvertent, mistaken, or even intentional — that would defeat the very purpose for which the privilege exists."). The showing the government must make to prevail on a claim of state secrets privilege may be especially difficult when attempted before any request for specific information or evidence has actually been made, but foreclosing the government from even trying to make that showing would be inconsistent with the need to protect state secrets.

### 2. *The Court's Independent Evaluation of the Claim of Privilege*

When the privilege has been properly invoked, "we must make an independent determination whether the information is privileged." *Al-Haramain*, 507 F.3d at 1202. The court must sustain a claim of privilege when it is satisfied, "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. If this standard is met, the evidence is absolutely privileged, irrespective of the plaintiffs' countervailing need for it. *See id.* at 11 ("[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that [state] secrets are at stake."); *Halkin*, 690 F.2d at 990.

This step in the *Reynolds* analysis "places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system." *Al-Haramain*, 507 F.3d at 1203. In evaluating the need for secrecy, "we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena." *Id.* But "the state secrets doctrine does not represent a surrender of judicial control over access to the courts." *El-Masri*, 479 F.3d at 312. Rather, "to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation." *Ellsberg*, 709 F.2d at 58. "We take very seriously our obligation to review the [government's claims] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege," *Al-Haramain*, 507 F.3d at 1203, though we must "do so without forcing a disclosure of the very thing the privilege is designed to protect . . . . Too much judicial inquiry into the claim of privilege would force disclosure of

the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses." *Reynolds*, 345 U.S. at 8.

**[6]** We do not offer a detailed definition of what constitutes a state secret. The Supreme Court in *Reynolds* found it sufficient to say that the privilege covers "matters which, in the interest of national security, should not be divulged." *Id.* at 10. We do note, however, that an executive decision to *classify* information is insufficient to establish that the information is privileged. *See Ellsberg*, 709 F.2d at 57 ("[T]he privilege may not be used to shield any material not strictly necessary to prevent injury to national security."). Although classification may be an indication of the need for secrecy, treating it as conclusive would trivialize the court's role, which the Supreme Court has clearly admonished "cannot be abdicated to the caprice of executive officers." *Reynolds*, 345 U.S. at 9-10.

### 3. How Should the Matter Proceed?

When a court sustains a claim of privilege, it must then resolve " 'how the matter should proceed in light of the successful privilege claim.' " *Al-Haramain*, 507 F.3d at 1202 (quoting *El-Masri*, 479 F.3d at 304). The court must assess whether it is feasible for the litigation to proceed without the protected evidence and, if so, how.

When the government successfully invokes the state secrets privilege, "the evidence is completely removed from the case." *Kasza*, 133 F.3d at 1166. " '[W]henever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.' " *Id.* (quoting *Ellsberg*, 709 F.2d at 57). However, there will be occasions when, as a practical matter, secret and nonsecret information cannot be separated. In some cases, therefore, "it is appropriate that the courts restrict the parties' access not only to evidence which itself risks the disclosure of a state

secret, but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures." *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1143-44 (5th Cir. 1992); *see also Kasza*, 133 F.3d at 1166 ("[I]f seemingly innocuous information is part of a . . . mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other [i.e., secret] information.").

Ordinarily, simply excluding or otherwise walling off the privileged information may suffice to protect the state secrets and " 'the case will proceed accordingly, with no consequences save those resulting from the loss of evidence.' " *Al-Haramain*, 507 F.3d at 1204 (quoting *Ellsberg*, 709 F.2d at 64); *see, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988) (permitting case to continue without privileged evidence); *Reynolds*, 345 U.S. at 11-12 (same).

In some instances, however, application of the privilege may require dismissal of the action. When this point is reached, the *Reynolds* privilege converges with the *Totten* bar, because both require dismissal. There are three circumstances when the *Reynolds* privilege would justify terminating a case.

First, if "the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case." *Kasza*, 133 F.3d at 1166; *see also Ellsberg*, 709 F.2d at 65. Second, " 'if the privilege deprives the defendant of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant.' " *Kasza*, 133 F.3d at 1166 (quoting *Bareford*, 973 F.2d at 1141); *accord In re Sealed Case*, 494 F.3d 139, 153 (D.C. Cir. 2007); *see also, e.g.*, *Tenenbaum v. Simonini,* 372 F.3d 776, 777 (6th Cir. 2004).

**[7]** Third, and relevant here, even if the claims and defenses might theoretically be established without relying on

privileged evidence, it may be impossible to proceed with the litigation because — privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses — litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets. *See, e.g.*, *In re Sealed Case*, 494 F.3d at 153 ("If the district court determines that the subject matter of a case is so sensitive that there is no way it can be litigated without risking national secrets, then the case must be dismissed."); *El-Masri*, 479 F.3d at 308 ("[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information's disclosure."); *Bareford*, 973 F.2d at 1144 ("We are compelled to conclude that the trial of this case would inevitably lead to a significant risk that highly sensitive information concerning this defense system would be disclosed."); *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1241-42 (4th Cir. 1985) ("[I]n some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters."); *Farnsworth Cannon*, 635 F.2d at 281 (dismissing the action at the outset because "any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation"); *id.* at 279-80 (Phillips, J., specially concurring and dissenting from the three-judge panel decision) (concluding that "litigation should be entirely foreclosed at the outset by dismissal of the action" if it appears that "the danger of inadvertent compromise of the protected state secrets outweighs the public and private interests in attempting formally to resolve the dispute while honoring the privilege"). As we shall explain, this circumstance exists here and requires dismissal.

## IV.  APPLICATION

We therefore turn to the application of the state secrets doctrine in this case. The government contends that plaintiffs' lawsuit should be dismissed, whether under the *Totten* bar or the *Reynolds* privilege, because "state secrets are so central to this case that permitting further proceeding[s] would create an intolerable risk of disclosure that would jeopardize national security." U.S. Br. 13.[6] Plaintiffs argue that the *Totten* bar does not apply and that, even if the government is entitled to some protection under the *Reynolds* privilege, at least some claims survive. The district court appears to have dismissed the action under the *Totten* bar, making a "threshold determination" that "the very subject matter of the case is a state secret." Having dismissed on that basis, the district court did not address whether application of the *Reynolds* privilege would require dismissal.

We do not find it quite so clear that the very subject matter of this case is a state secret. Nonetheless, having conducted our own detailed analysis, we conclude that the district court reached the correct result because dismissal is warranted even under *Reynolds*. Recognizing the serious consequences to plaintiffs of dismissal, we explain our ruling so far as possible within the considerable constraints imposed on us by the state secrets doctrine itself.

### A.  The *Totten* Bar

The categorical, "absolute protection [the Court] found necessary in enunciating the *Totten* rule" is appropriate only in narrow circumstances. *Tenet*, 544 U.S. at 11. The *Totten* bar applies only when the "very subject matter" of the action is a state secret — i.e., when it is "obvious" without conducting

---

[6]The government's classified briefing and supporting declarations provide more specific support for the government's state secrets contentions. This information is crucial to our decision. *See El-Masri*, 479 F.3d at 312.

the detailed analysis required by *Reynolds* "that the action [c]ould never prevail over the privilege." *Reynolds*, 345 U.S. at 11 n.26. The Court has applied the *Totten* bar on just three occasions, involving two different kinds of state secrets: In *Tenet* and *Totten* the Court applied the *Totten* bar to "the distinct class of cases that depend upon clandestine spy relationships," *see Tenet*, 544 U.S. at 9-10; *Totten*, 92 U.S. at 107, and in *Weinberger* the Court applied the *Totten* bar to a case that depended on whether the Navy proposed to store nuclear weapons at a particular facility, *see Weinberger*, 454 U.S. at 146-47. Although the Court has not limited the *Totten* bar to cases premised on secret espionage agreements or the location of nuclear weapons, neither has it offered much guidance on when the *Totten* bar applies beyond these limited circumstances. Because the *Totten* bar is rarely applied and not clearly defined, because it is a judge-made doctrine with extremely harsh consequences and because conducting a more detailed analysis will tend to improve the accuracy, transparency and legitimacy of the proceedings, district courts presented with disputes about state secrets should ordinarily undertake a detailed *Reynolds* analysis before deciding whether dismissal on the pleadings is justified.

Here, some of plaintiffs' claims *might well fall within the Totten* bar. In particular, their allegations that Jeppesen conspired with agents of the United States in plaintiffs' forced disappearance, torture and degrading treatment are premised on the existence of an alleged covert relationship between Jeppesen and the government — a matter that the Fourth Circuit has concluded is "practically indistinguishable from that categorically barred by *Totten* and *Tenet*." *El-Masri*, 479 F.3d at 309.[7] On the other hand, allegations based on plaintiffs'

---

[7]We do not decide whether any of plaintiffs' claims are cognizable under the Alien Tort Statute ("ATS"). But assuming that the conspiracy claims are cognizable, they require proof of an agreement. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009) (holding that conspiracy liability under the ATS would require

theory that Jeppesen should be liable simply for what it "should have known" about the alleged unlawful extraordinary rendition program while participating in it are not so obviously tied to proof of a secret agreement between Jeppesen and the government.

[8] We do not resolve the difficult question of precisely which claims may be barred under *Totten* because application of the *Reynolds* privilege leads us to conclude that this litigation cannot proceed further. We rely on the *Reynolds* privilege rather than the *Totten* bar for several reasons. First, the government has asserted the *Reynolds* privilege along with the *Totten* bar, inviting the further inquiry *Reynolds* requires and presenting a record that compels dismissal even on this alternate ground. Second, we have discretion to affirm on any basis supported by the record. *See Thigpen v. Roberts*, 468 U.S. 27, 29-30 (1984); *Shanks v. Dressel*, 540 F.3d 1082, 1086 (9th Cir. 2008). Third, resolving this case under *Reynolds* avoids difficult questions about the precise scope of the *Totten* bar and permits us to conduct a searching judicial review, fulfilling our obligation under *Reynolds* "to review the [government's claim] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's

---

either an "agreement" or " 'a criminal intention to participate in a common criminal design' ") (quoting *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeal Judgment, ¶ 206 (July 15, 1999)); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (holding that conspiracy liability under the ATS requires proof that "two or more persons agreed to commit a wrongful act"). Plaintiffs' allegations confirm that their conspiracy claims depend on proof of a covert relationship. *See, e.g.*, First Am. Compl. ¶ 255 ("Jeppesen entered into an agreement with agents of the United States to unlawfully render Plaintiffs to secret detention in Morocco, Egypt, and Afghanistan."); *id.* ¶ 262 ("Defendant entered into an agreement with agents of the United States to provide flight and logistical support services to aircraft and crew used in the extraordinary rendition program to unlawfully render Plaintiffs to detention and interrogation in Morocco, Egypt, and Afghanistan, where they would be subjected to acts of torture and other cruel, inhuman or degrading treatment.").

claim or justification of privilege." *Al-Haramain*, 507 F.3d at 1203.[8]

## B.    The *Reynolds* Privilege

**[9]** There is no dispute that the government has complied with *Reynolds'* procedural requirements for invoking the state secrets privilege by filing General Hayden's formal claim of privilege in his public declaration.[9] We therefore focus on the second and third steps in the *Reynolds* analysis: *First*, whether and to what extent the matters the government contends must be kept secret are in fact matters of state secret; and *second*, if they are, whether the action can be litigated without relying on evidence that would necessarily reveal those secrets or press so closely upon them as to create an unjustifiable risk that they would be revealed. In doing so, we explain our decision as much as we can without compromising the secrets we are required to protect.

### 1.    Whether and to What Extent the Evidence Is Privileged

**[10]** The government asserts the state secrets privilege over four categories of evidence. In particular, the government contends that neither it nor Jeppesen should be compelled, through a responsive pleading, discovery responses or otherwise, to disclose: "[1] information that would tend to confirm or deny whether Jeppesen or any other private entity assisted the CIA with clandestine intelligence activities; [2]

---

[8]This skepticism is all the more justified in cases that allege serious government wrongdoing. Such allegations heighten the risk that government officials may be motivated to invoke the state secrets doctrine not only by their obligation to protect national security but also by a desire to protect themselves or their associates from scrutiny.

[9]As previously noted, the government filed declarations meeting the procedural requirements for the *Reynolds* privilege even though such declarations are not strictly necessary to support a *Totten* claim. *See Tenet*, 544 U.S. at 11.

information about whether any foreign government cooperated with the CIA in clandestine intelligence activities; [3] information about the scope or operation of the CIA terrorist detention and interrogation program; [or 4] any other information concerning CIA clandestine intelligence operations that would tend to reveal intelligence activities, sources, or methods." U.S. Br. 7-8. These indisputably are matters that the state secrets privilege may cover. *See, e.g.*, *Tenet*, 544 U.S. at 11 (emphasizing the "absolute protection" the state secrets doctrine affords against revealing espionage relationships); *CIA v. Sims*, 471 U.S. 159, 175 (1985) ("Even a small chance that some court will order disclosure of a source's identity could well impair intelligence gathering and cause sources to 'close up like a clam.' "); *In re Sealed Case*, 494 F.3d at 152 (prohibiting "all discussion of intelligence sources, capabilities, and the like"); *Al-Haramain*, 507 F.3d at 1204 (applying the privilege to "the means, sources and methods of intelligence gathering"); *Ellsberg*, 709 F.2d at 57 (applying the privilege to the "disclosure of intelligence-gathering methods or capabilities").

[11] We have thoroughly and critically reviewed the government's public and classified declarations and are convinced that at least some of the matters it seeks to protect from disclosure in this litigation are valid state secrets, "which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. The government's classified disclosures to the court are persuasive that compelled or inadvertent disclosure of such information in the course of litigation would seriously harm legitimate national security interests. In fact, every judge who has reviewed the government's formal, classified claim of privilege in this case agrees that in this sense the claim of privilege is proper, although we have different views as to the scope of the privilege and its impact on plaintiffs' case. The plaintiffs themselves "do not dispute that, during the course of litigation, there may well be relevant evidence that may be properly withheld pursuant to the privilege." Br. of Plaintiffs-Appellants 26. *See El-Masri*,

479 F.3d at 308-13 (affirming the dismissal of a case involving essentially the same types of claims on the basis of the states secrets doctrine).

**[12]** We are precluded from explaining precisely which matters the privilege covers lest we jeopardize the secrets we are bound to protect. *See Black*, 62 F.3d at 1119 ("Care in protecting state secrets is necessary not only during a court's review of the evidence, but in its subsequent treatment of the question in any holding; a properly phrased opinion should not strip the veil from state secrets even if ambiguity results in a loss of focus and clarity."). We can say, however, that the secrets fall within one or more of the four categories identified by the government and that we have independently and critically confirmed that their disclosure could be expected to cause significant harm to national security.

### 2.   *Effect on the Proceedings*

Having determined that the privilege applies, we next determine whether the case must be dismissed under the *Reynolds* privilege.[10] We have thoroughly considered plaintiffs' claims, several possible defenses and the prospective

---

[10]As noted earlier, the district court did not conduct a detailed analysis of plaintiffs' several claims because it concluded that the subject matter of the entire case is a state secret and therefore dismissed under the *Totten* bar. One option, vigorously urged by the dissent, would be to remand to the district court for that court to conduct a more detailed analysis in the first instance. As the case has developed during these en banc proceedings, however, we find remand unnecessary because our own *Reynolds* analysis persuades us that the litigation cannot proceed. Although it would have been preferable for the district court to conduct this analysis first, we now have had to do it ourselves and it makes no sense to suspend our own judgment that — given the record before us and the nature of plaintiffs' claims — this case realistically cannot be litigated against Jeppesen without compromising state secrets. There is thus no point, and much risk, in remanding to the district court to go through the *Reynolds* analysis as the dissent would prefer. We accept and respect the principles that motivate the dissent, but those principles do not justify prolonging the process here.

path of this litigation. We also have carefully and skeptically reviewed the government's classified submissions, which include supplemental information not presented to the district court. We rely heavily on these submissions, which describe the state secrets implicated here, the harm to national security that the government believes would result from explicit or implicit disclosure and the reasons why, in the government's view, further litigation would risk that disclosure.

[13] Given plaintiffs' extensive submission of public documents and the stage of the litigation, we do not rely on the first two circumstances in which the *Reynolds* privilege requires dismissal — that is, whether plaintiffs could prove a prima facie case without privileged evidence, or whether the privilege deprives Jeppesen of evidence that would otherwise give it a valid defense to plaintiffs' claims. *See Kasza*, 133 F.3d at 1166; *supra* Part III.B.3.[11] Instead, we assume without deciding that plaintiffs' prima facie case and Jeppesen's defenses may not inevitably depend on privileged evidence. Proceeding on that assumption, we hold that dismissal is

---

[11]As noted before, *see supra* n. 7 and related text, at least some of plaintiffs' claims would require proof of an agreement or covert relationship between the government and Jeppesen. These claims might well be barred under *Totten* and certainly would fall even under a *Reynolds* analysis. The dissent, however, suggests that plaintiffs could establish a prima facie case for at least two of their claims without relying on privileged evidence and perhaps without any discovery at all — namely, that Jeppesen recklessly provided flight and logistical support for rendition flights while it knew or should have known its support was being used for forced disappearance and torture. See Dissent Appendix. Although our holding does not require us to resolve this question, we are not so sure. Plaintiffs' reliance on information set forth in the dissent's Appendix would have to overcome evidentiary and other obstacles, such as hearsay problems and the fact that the vast majority of the media reports cited as putting Jeppesen on notice were published *after* Jeppesen's services were alleged to have occurred. In any event, our own analysis under the third aspect of *Reynolds* persuades us these "knew or should have known" claims must be dismissed as well.

nonetheless required under *Reynolds* because there is no feasible way to litigate Jeppesen's alleged liability *without creating an unjustifiable risk of divulging state secrets. See El-*Masri, 479 F.3d at 312 (coming to the same conclusion in a related and comparable case), *cert. denied*, 552 U.S. 947 (2007).[12]

---

[12]In *El-Masri*, the Supreme Court declined to review the Fourth Circuit's dismissal of similar claims against the various United States government and corporate actors alleged to be more directly responsible for the rendition and interrogation programs at issue here. Nothing in the Supreme Court's state secrets jurisprudence suggests that plaintiffs' claims here, against an alleged provider of logistical support to those programs, should proceed where claims against the government and corporate actors who plaintiffs allege were primarily responsible failed.

As the dissent correctly notes, we have previously disapproved of *El-Masri* for conflating the *Totten* bar's "very subject matter" inquiry with the *Reynolds* privilege. *See Al-Haramain*, 507 F.3d at 1201. We adhere to that approach today by maintaining a distinction between the *Totten* bar on the one hand and the *Reynolds* privilege on the other. *See Tenet*, 544 U.S. at 9 (explaining that Reynolds "in no way signaled our retreat from *Totten*'s broader holding that lawsuits premised on alleged espionage agreements are altogether forbidden"). Maintaining that distinction, however, does not mean that the *Reynolds* privilege can never be raised prospectively or result in a dismissal at the pleading stage. As we explained in *Al-Haramain* (as do we in the text), the *Totten* bar and the *Reynolds* privilege form a "continuum of analysis." 507 F.3d at 1201. A case may fall outside the *Totten* bar because its "very subject matter" is not a state secret, and yet it may become clear in conducting a *Reynolds* analysis that plaintiffs cannot establish a prima facie case, that defendants are deprived of a valid defense or that the case cannot be litigated without presenting either a certainty or an unacceptable risk of revealing state secrets. When that point is reached, including, if applicable, at the pleading stage, dismissal is appropriate under the *Reynolds* privilege. Notwithstanding its erroneous conflation of the *Totten* bar and the *Reynolds* privilege, we rely on *El-Masri* because it properly concluded — with respect to allegations comparable to those here — that "virtually any conceivable response to [plaintiffs'] allegations would disclose privileged information," and, therefore, that the action could not be litigated "without threatening the disclosure" of state secrets. *El-Masri*, 479 F.3d at 308, 310.

**[14]** We reach this conclusion because all seven of plaintiffs' claims, even if taken as true, describe Jeppesen as providing logistical support in a broad, complex process, certain aspects of which, the government has persuaded us, are absolutely protected by the state secrets privilege. Notwithstanding that some information about that process has become public, Jeppesen's alleged role and its attendant liability cannot be isolated from aspects that are secret and protected. Because the facts underlying plaintiffs' claims are so infused with these secrets, *any* plausible effort by Jeppesen to defend against them would create an unjustifiable risk of revealing state secrets, even if plaintiffs could make a prima facie case on one or more claims with nonprivileged evidence. *See Kasza*, 133 F.3d at 1170; *Black*, 62 F.3d at 1118 ("[P]roof of 'the factual allegations in the Amended Complaint are so tied to the privileged information that further litigation will constitute an undue threat that privileged information will be disclosed.' ") (quoting and affirming the district court); *Bareford*, 973 F.2d at 1144 ("[T]he danger that witnesses might divulge some privileged material during cross-examination is great because the privileged and non-privileged material are inextricably linked. We are compelled to conclude that the trial of this case would inevitably lead to a significant risk that highly sensitive information concerning this defense system would be disclosed."); *Fitzgerald*, 776 F.2d at 1243 ("In examining witnesses with personal knowledge of relevant military secrets, the parties would have every incentive to probe dangerously close to the state secrets themselves. In these circumstances, state secrets could be compromised even without direct disclosure by a witness."); *Farnsworth Cannon*, 635 F.2d at 281 ("[T]he plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing. It is evident that any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this

litigation."); *see also In re Sealed Case*, 494 F.3d at 152-54 (acknowledging the appropriateness of dismissal when unprivileged and privileged matters are so entwined that the risk of disclosure of privileged material is unacceptably high, although concluding that the case before the court did not fall within that category).

Here, further litigation presents an unacceptable risk of disclosure of state secrets no matter what legal or factual theories Jeppesen would choose to advance during a defense. Whether or not Jeppesen provided logistical support in connection with the extraordinary rendition and interrogation programs, there is precious little Jeppesen could say about its relevant conduct and knowledge without revealing information about how the United States government does *or does not* conduct covert operations. Our conclusion holds no matter what protective procedures the district court might employ. Adversarial litigation, including pretrial discovery of documents and witnesses and the presentation of documents and testimony at trial, is inherently complex and unpredictable. Although district courts are well equipped to wall off isolated secrets from disclosure, the challenge is exponentially greater in exceptional cases like this one, where the relevant secrets are difficult or impossible to isolate and even efforts to define a boundary between privileged and unprivileged evidence would risk disclosure by implication. In these rare circumstances, the risk of disclosure that further proceedings would create cannot be averted through the use of devices such as protective orders or restrictions on testimony.

[15] Dismissal at the pleading stage under *Reynolds* is a drastic result and should not be readily granted. We are not persuaded, however, by the dissent's views that the state secrets privilege can never be "asserted during the pleading stage to excise entire allegations," or that the government must be required "to make its claims of state secrets with regard to specific items of evidence or groups of such items as their use is sought in the lawsuit." Dissent 13560, 13565.

A case may fall outside the *Totten* bar and yet it may become clear during the *Reynolds* analysis that dismissal is required at the outset. *See Al-Haramain*, 507 F.3d at 1201 (explaining that the *Totten* bar and the *Reynolds* privilege form a "continuum of analysis," and that in some cases "the suit itself may not be barred because of its subject matter and yet ultimately, the state secrets privilege may nonetheless preclude the case from proceeding to the merits," even without "await[ing] preliminary discovery"). Here, our detailed *Reynolds* analysis reveals that the claims and possible defenses are so infused with state secrets that the risk of disclosing them is both apparent and inevitable. Dismissal under these circumstances, like dismissal under the *Totten* bar, reflects the general principle that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." *Totten*, 92 U.S. at 107.

\* \* \*

Although we are necessarily precluded from explaining precisely why this case cannot be litigated without risking disclosure of state secrets, or the nature of the harm to national security that we are convinced would result from further litigation, we are able to offer a few observations.

**[16]** *First*, we recognize that plaintiffs have proffered hundreds of pages of publicly available documents, many catalogued in the dissent's Appendix, that they say corroborate some of their allegations concerning Jeppesen's alleged participation in aspects of the extraordinary rendition program. As the government has acknowledged, its claim of privilege does not extend to public documents. Accordingly, we do not hold that any of the documents plaintiffs have submitted are subject to the privilege; rather, we conclude that even assuming plaintiffs could establish their entire case *solely* through nonprivileged evidence — unlikely as that may be —

any effort by Jeppesen to defend would unjustifiably risk disclosure of state secrets. *Cf. El-Masri*, 479 F.3d at 309 (concluding that "virtually any conceivable response [by government defendants to claims based on factual allegations materially identical to this case's] . . . would disclose privileged information").

**[17]** *Second*, we do not hold that the existence of the extraordinary rendition program is itself a state secret. The program has been publicly acknowledged by numerous government officials including the President of the United States. Even if its mere existence may once have been a "matter[ ] which, in the interest of national security, should not be divulged," it is not a state secret now. *Reynolds*, 345 U.S. at 10; *cf. Al-Haramain*, 507 F.3d at 1193 (concluding "[i]n light of extensive government disclosures" that a warrantless wiretapping program was not a matter of state secret). Nonetheless, partial disclosure of the existence and even some aspects of the extraordinary rendition program does not preclude other details from remaining state secrets if *their* disclosure would risk grave harm to national security. *See Al-Haramain*, 507 F.3d at 1203 (concluding that some undisclosed details of the wiretapping program were entitled to protection under the state secrets privilege); *Halkin*, 690 F.2d at 994 ("We reject, as we have previously, the theory that 'because some information about the project ostensibly is now in the public domain, nothing about the project in which the appellants have expressed an interest can properly remain classified' or otherwise privileged from disclosure." (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 752 (D.C. Cir. 1981)))*; see also Bareford*, 973 F.2d at 1144 (explaining that in some circumstances, "disclosure of information by government officials can be prejudicial to government interests, even if the information has already been divulged from non-government sources").

*Third*, we acknowledge the government's certification at oral argument that its assertion of the state secrets privilege

comports with the revised standards set forth in the current administration's September 23, 2009 memorandum, adopted several years after the government first invoked the privilege in this case. Those standards require the responsible agency to show that "assertion of the privilege is necessary to protect information the unauthorized disclosure of which reasonably could be expected to cause significant harm to the national defense or foreign relations." *Holder Memo, supra*, at 1. They also mandate that the Department of Justice "will not defend an invocation of the privilege in order to: (i) conceal violations of the law, inefficiency, or administrative error; (ii) prevent embarrassment to a person, organization, or agency of the United States government; (iii) restrain competition; or (iv) prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." *Id.* at 2. That certification here is consistent with our independent conclusion, having reviewed the government's public and classified declarations, that the government is not invoking the privilege to avoid embarrassment or to escape scrutiny of its recent controversial transfer and interrogation policies, rather than to protect legitimate national security concerns.

## V. OTHER REMEDIES

Our holding today is not intended to foreclose — or to prejudge — possible *nonjudicial* relief, should it be warranted for any of the plaintiffs. Denial of a judicial forum based on the state secrets doctrine poses concerns at both individual and structural levels. For the individual plaintiffs in this action, our decision forecloses at least one set of judicial remedies, and deprives them of the opportunity to prove their alleged mistreatment and obtain damages. At a structural level, terminating the case eliminates further judicial review in this civil litigation, one important check on alleged abuse by government officials and putative contractors. Other remedies may partially mitigate these concerns, however, although we rec-

ognize each of these options brings with it its own set of concerns and uncertainties.

First, that the judicial branch may have deferred to the executive branch's claim of privilege in the interest of national security does not preclude the government from honoring the fundamental principles of justice. The government, having access to the secret information, can determine whether plaintiffs' claims have merit and whether misjudgments or mistakes were made that violated plaintiffs' human rights. Should that be the case, the government may be able to find ways to remedy such alleged harms while still maintaining the secrecy national security demands. For instance, the government made reparations to Japanese Latin Americans abducted from Latin America for internment in the United States during World War II. *See Mochizuki v. United States*, 43 Fed. Cl. 97 (1999).[13]

Second, Congress has the authority to investigate alleged wrongdoing and restrain excesses by the executive branch.[14] "The power of the Congress to conduct investigations is inherent in the legislative process." *Watkins v. United States*, 354 U.S. 178, 187 (1957); *accord Eastland v. U.S. Service-*

---

[13]Other governments have committed to doing this. *See, e.g.*, Prime Minister David Cameron, A Statement Given by the Prime Minister to the House of Commons on the Treatment of Terror Suspects (July 6, 2010), http://www.number10.gov.uk/news/statements-and-articles/2010/07/statement-on-detainees-52943 ("[W]e are committed to mediation with those who have brought civil claims about their detention in Guantanamo. And wherever appropriate, we will offer compensation.").

[14]In addition, Congress has constituted independent investigatory bodies within the executive branch. *See, e.g.*, 50 U.S.C. § 403q (establishing the Office of Inspector General in the Central Intelligence Agency "to initiate and conduct independently inspections, investigations, and audits relating to programs and operations of the Agency"); *see also* Office of Inspector General, Central Intelligence Agency, Special Review: Counterterrorism Detention and Interrogation Activities (September 2001 — October 2003), May 7, 2004 (partially redacted), *available at* http://graphics8.nytimes.com/packages/pdf/politics/20090825-DETAIN/2004CIAIG.pdf.

*men's Fund*, 421 U.S. 491, 504 (1975). "Congress unquestionably has . . . broad authority to investigate, to inform the public, and, ultimately, to legislate against suspected corruption and abuse of power in the Executive Branch." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 498 (1977) (Powell, J., concurring); *see also Branzburg v. Hayes*, 408 U.S. 665, 741 (1972) (Stewart, J., dissenting) ("We have long recognized the value of the role played by legislative investigations . . . .").

Third, Congress also has the power to enact private bills. *See Nixon v. Fitzgerald*, 457 U.S. 731, 762 n.5 (1982) (Burger, C.J., concurring) ("For uncompensated injuries Congress may in its discretion provide separate nonjudicial remedies such as private bills."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 n.9 (1995) ("Private bills in Congress are still common, and were even more so in the days before establishment of the Claims Court."); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 431 (1990) ("Congress continues to employ private legislation to provide remedies in individual cases of hardship."). Because as a general matter the federal courts are better equipped to handle claims, *see Kosak v. United States*, 465 U.S. 848, 867-69 (1984) (Stevens, J., dissenting), Congress can refer the case to the Court of Federal Claims to make a recommendation before deciding whether to enact a private bill, *see* 28 U.S.C. § 1492; *see also Banfi Prods. Corp. v. United States*, 40 Fed. Cl. 107, 109 (1997), although Congress alone will make the ultimate decision. When national security interests deny alleged victims of wrongful governmental action meaningful access to a judicial forum, private bills may be an appropriate alternative remedy.[15]

---

[15]Proceedings in the Court of Federal Claims following congressional referral may pose some of the same problems that require dismissal here — the Court of Federal Claims must avoid disclosure of state secrets too. The referral proceedings might be less problematic than this lawsuit, however, because, for example, the question of third-party liability would not be the focus: a private bill addresses compensation by the government, not

Fourth, Congress has the authority to enact remedial legislation authorizing appropriate causes of action and procedures to address claims like those presented here. When the state secrets doctrine "compels the subordination of appellants' interest in the pursuit of their claims to the executive's duty to preserve our national security, this means that remedies for . . . violations that cannot be proven under existing legal standards, if there are to be such remedies, must be provided by Congress. That is where the government's power to remedy wrongs is ultimately reposed." *Halkin v. Helms*, 690 F.2d at 1001 (footnote omitted).

## VI. CONCLUSION

We, like the dissent, emphasize that it should be a rare case when the state secrets doctrine leads to dismissal at the outset of a case. Nonetheless, there are such cases — not just those subject to *Totten*'s per se rule, but those where the mandate for dismissal is apparent even under the more searching examination required by *Reynolds*. This is one of those rare cases.

For all the reasons the dissent articulates — including the impact on human rights, the importance of constitutional protections and the constraints of a judge-made doctrine — we do not reach our decision lightly or without close and skeptical scrutiny of the record and the government's case for secrecy and dismissal. We expect our decision today to

---

by third parties. In addition, Congress might tailor its referral to protect state secrets, by, for example, requiring the Court of Federal Claims to make its recommendation based solely on the plaintiffs' own testimony and nonprivileged documents in the public domain. Moreover, Congress presumably possesses the power to restrict application of the state secrets privilege in the referral proceedings. *Cf. Al-Haramain*, 507 F.3d at 1205-06 (remanding to the district court to consider whether the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1806(f), preempts the state secrets privilege).

inform district courts that *Totten* has its limits, that every effort should be made to parse claims to salvage a case like this using the *Reynolds* approach, that the standards for peremptory dismissal are very high and it is the district court's role to use its fact-finding and other tools to full advantage before it concludes that the rare step of dismissal is justified. We also acknowledge that this case presents a painful conflict between human rights and national security. As judges, we have tried our best to evaluate the competing claims of plaintiffs and the government and resolve that conflict according to the principles governing the state secrets doctrine set forth by the United States Supreme Court.

**[18]** For the reasons stated, we hold that the government's valid assertion of the state secrets privilege warrants dismissal of the litigation, and affirm the judgment of the district court.[16] The government shall bear all parties' costs on appeal.

**AFFIRMED.**

---

BEA, Circuit Judge, concurring:

I concur with Judge Fisher's well-reasoned opinion and join fully in his result. I also concur with Judge Fisher's analysis with respect to *United States v. Reynolds*, 345 U.S. 1 (1953). I write separately only because I would decide this case under *Totten v. United States*, 92 U.S. 105, 107 (1876).

---

[16]We do not share the dissent's confidence that the present proceedings come within Federal Rule of Civil Procedure 12(b)(6). Dissent 13559-60, 13565. *Reynolds* necessarily entails consideration of materials outside the pleadings: at minimum, the *Reynolds* analysis requires the court to review the government's formal claim of privilege. That fact alone calls into question reliance on Rule 12(b)(6). *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

The *Totten* bar requires our courts to dismiss cases "where the very subject matter of the action" is "a matter of state secret." *Reynolds*, 345 U.S. at 11 n.26. In this case, every claim in the Plaintiffs' complaint is based on the allegation that officials of the United States government arrested and detained Plaintiffs and subjected them to specific interrogation techniques. Those alleged facts, not merely Jeppesen's role in such activities, are a matter of state secret.

---

HAWKINS, Circuit Judge, with whom Judges SCHROEDER, CANBY, THOMAS, and PAEZ, Circuit Judges, join, dissenting:

### *A Flawed Procedure*

I agree with my colleagues in the majority that *United States v. Reynolds*, 345 U.S. 1 (1953), is a rule of evidence, requiring courts to undertake a careful review of evidence that might support a claim or defense to determine whether either could be made without resort to legitimate state secrets. I part company concerning when and where that review should take place.

The majority dismisses the case in its entirety before Jeppesen has even filed an answer to Plaintiffs' complaint. Outside of the narrow *Totten* context, the state secrets privilege has never applied to prevent parties from litigating the truth or falsity of allegations, or facts, or information simply because the government regards the truth or falsity of the allegations to be secret. Within the *Reynolds* framework, dismissal is justified if and only if specific privileged evidence is itself indispensable to establishing either the truth of the plaintiffs' allegations or a valid defense that would otherwise be available to the defendant. *See, e.g.*, *Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998).

This is important, because an approach that focuses on specific evidence after issues are joined has the benefit of confining the operation of the state secrets doctrine so that it will sweep no more broadly than clearly necessary. The state secrets doctrine is a judicial construct without foundation in the Constitution, yet its application often trumps what we ordinarily consider to be due process of law. This case now presents a classic illustration. Plaintiffs have alleged facts, which must be taken as true for purposes of a motion to dismiss, that any reasonable person would agree to be gross violations of the norms of international law, remediable under the Alien Tort Statute. They have alleged in detail Jeppesen's complicity or recklessness in participating in these violations. The government intervened, and asserted that the suit would endanger state secrets. The majority opinion here accepts that threshold objection by the government, so Plaintiffs' attempt to prove their case in court is simply cut off. They are not even allowed to attempt to prove their case by the use of non-secret evidence in their own hands or in the hands of third parties.

It is true that, judicial construct though it is, the state secrets doctrine has become embedded in our controlling decisional law. Government claims of state secrets therefore must be entertained by the judiciary. But the doctrine is so dangerous as a means of hiding governmental misbehavior under the guise of national security, and so violative of common rights to due process, that courts should confine its application to the narrowest circumstances that still protect the government's essential secrets.[1] When, as here, the doctrine is

---

[1]Abuse of the Nation's information classification system is not unheard of. Former U.S. Solicitor General Erwin Griswold, who argued the government's case in the Pentagon Papers matter, later explained in a *Washington Post* editorial that "[i]t quickly becomes apparent to any person who has considerable experience with classified material that there is massive overclassification, and that the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of

successfully invoked at the threshold of litigation, the claims of secret are necessarily broad and hypothetical. The result is a maximum interference with the due processes of the courts, on the most general claims of state secret privilege. It is far better to require the government to make its claims of state secrets with regard to specific items of evidence or groups of such items as their use is sought in the lawsuit. An official certification that evidence is truly a state secret will be more focused if the head of a department must certify that specific evidence sought in the course of litigation is truly a secret and cannot be revealed without danger to overriding, essential government interests. And when responsive pleading is complete and discovery under way, judgments as to whether secret material is essential to Plaintiffs' case or Jeppesen's defense can be made more accurately.

---

one sort or another." Erwin N. Griswold, *Secrets Not Worth Keeping: the Courts and Classified Information*, Wash. Post, Feb. 15, 1989, at A25.

Former Attorney General Herbert Brownell similarly complained in a 1953 letter to President Eisenhower that classification procedures were then "so broadly drawn and loosely administered as to make it possible for government officials to cover up their own mistakes and even their wrongdoing under the guise of protecting national security." Letter from Attorney General Herbert Brownell to President Dwight Eisenhower (June 15,1953) (quoted in Kenneth R. Mayer, *With the Stroke of a Pen: Executive Orders and Presidential Power* 145 (2001)).

Even in *Reynolds*, avoidance of embarrassment—not preservation of state secrets—appears to have motivated the Executive's invocation of the privilege. There the Court credited the government's assertion that "this accident occurred to a military plane which had gone aloft to test secret electronic equipment," and that "there was a reasonable danger that the accident investigation report would contain references to the secret electronic equipment which was the primary concern of the mission." 345 U.S. at 10. In 1996, however, the "secret" accident report involved in that case was declassified. A review of the report revealed, not "details of any secret project the plane was involved in," but "[i]nstead, . . . a horror story of incompetence, bungling, and tragic error." Garry Wills, *Why the Government Can Legally Lie*, 56 N.Y. Rev. of Books 32, 33 (2009). Courts should be concerned to prevent a concentration of unchecked power that would permit such abuses.

By refusing to examine the voluminous public record materials submitted by Plaintiffs in support of their claims,[2] and by failing to undertake an analysis of Jeppesen's ability to defend against those claims, the district court forced every judge of the court of appeals to undertake that effort. This was no small undertaking. Materials the government considers top secret had to be moved securely back and forth across the country and made available in a "cone of silence" environment to first the three-judge panel assigned the case and then the twenty-seven active judges of this court to evaluate whether the case merited en banc consideration. This quite literally put the cart before the horse, depriving a reviewing court of a record upon which its traditional review function could be carried out.[3] This is more than a matter of convenience. Making factual determinations is the particular province of trial courts and for sound reason: they are good at it. Not directing the district court to do that work sends exactly the wrong message in the handling of these critical and sensitive cases. Finding remand "unnecessary," as the majority does here, [Maj. Op. at 13546, n.10], not only rewards district courts for failing to do their job, but ensures that future appeals courts will have to do that job for them.[4]

This is an appeal from a Rule 12 dismissal, which means that the district court was required to assume that the well-pleaded allegations of the complaint are *true*, and that we

---

[2]A summary of the some 1,800 pages of that information appears as an Appendix to this dissent.

[3]In another context, the Supreme Court has pointed out the structural problems created when appellate courts are presented with undeveloped records. *Johnson v. Jones*, 515 U.S. 304, 309, 316-17 (1998).

[4]I have confidence in the ability of district judges to make such determinations, and in the process of handling information which the government considers secret. Dismissing this suit out of fear of "compelled or inadvertent disclosure" of secret information during the course of litigation, [Maj. Op. at 13545], assumes that the government might make mistakes in what it produces, or that district courts might compel the disclosure of documents legitimately covered by the state secrets privilege.

"construe the complaint in the light most favorable to the plaintiff[s]." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). The majority minimizes the importance of these requirements by gratuitously attaching "allegedly" to nearly each sentence describing what Plaintiffs say happened to them, and by quickly dismissing the voluminous publicly available evidence supporting those allegations, including that Jeppesen knew what was going on when it arranged flights described by one of its own officials as "torture flights."[5] Instead, the majority assumes that even if Plaintiffs' prima facie case and Jeppesen's defense did not depend on privileged evidence, dismissal is required "because there is no feasible way to litigate Jeppesen's alleged liability without creating an unjustifiable risk of divulging state secrets." [Maj. Op. at 13548]. But Jeppesen has yet to answer or even to otherwise plead, so we have no idea what those defenses or assertions might be. Making assumptions about the contours of future litigation involves mere speculation, and doing so flies straight in the face of long standing principles of Rule 12 law by extending the inquiry to what *might* be divulged in future litigation.[6]

---

[5]According to the sworn declaration of former Jeppesen employee Sean Belcher, the Director of Jeppesen International Trip Planning Services, Bob Overby, told him, " 'We do all the extraordinary rendition flights,' " which he also referred to as " 'the torture flights' " or "spook flights." Belcher stated that "there were some employees who were not comfortable with that aspect of Jeppesen's business" because they knew " 'some of these flights end up' " with the passengers being tortured. He noted that Overby had explained, " 'that's just the way it is, we're doing them' " because "the rendition flights paid very well."

[6]*See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (3d ed. 2010) (Rule 12(b)(6) inquiries are "essentially . . . limited to the content of the complaint"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (listing permissible evidence to consider in a 12(b)(6) motion, with no mention of prospective evidence, and with emphasis on an examination of the "underlying facts"); *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1096 (9th Cir. 2008) (the court

We should have remanded this matter to district court to do the Reynolds work that should have been done in the first place.

Because of this fundamental defect in the posture of this matter, the remainder of the dissent focuses on the scope of the state secrets privilege rather than its application to speculative facts.

### *The* Totten *Bar*

While it chooses not to apply it, the majority correctly recites the general interpretation of the non-justiciability bar of *Totten v. United States*, 92 U.S. 105 (1876).[7] However, its definition of *Totten*'s scope—applying to "any case in which 'the very subject matter of the action' is 'a matter of state secret' "[Maj. Op. at 13531]—and the concurrence's full-blown embrace of its application here merit response.

Courts have applied the *Totten* bar in one of two scenarios: (1) The plaintiff is party to a secret agreement with the government;[8] or (2) The plaintiff sues to solicit information from the government on a "state secret" matter.[9] *See Weinberger v.*

---

may consider in a 12(b)(6) motion "only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice") (citing *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 899-900 (9th Cir. 2007)).

[7]*See, e.g.*, *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (discussing "the justiciability doctrine of *Totten v. United States*"); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 650 n.2 (6th Cir. 2007) (the *Totten* rule is a "rule of non-justiciability"); *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1197 (9th Cir. 2007) (the *Totten* rule is "a rule of non-justiciability, akin to a political question").

[8]*Totten* itself involved the estate of a former Civil War spy seeking compensation. 92 U.S. 105. *See also Tenet v. Doe*, 544 U.S. 1, 10 (2005) (suit against CIA director for failure to provide financial compensation for Cold War services).

[9]This category of *Totten*-bar cases is distinct from those involving a plaintiff's attempt to solicit information from the government via the Free-

*Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 146 (1981) (*Totten* bar applies to suit against the United States Navy for failure to file an environmental impact statement regarding a "nuclear capable" facility where Navy would have to admit or deny proposed storage of nuclear weapons at the facility). More generally, the *Totten* bar has been applied to suits against the government, and never to a plaintiff's suit against a third-party/non-governmental entity.

Here, the "very subject matter" of this lawsuit is Jeppesen's involvement in an overseas detention program. Plaintiffs are neither parties to a secret agreement with the government, nor are they attempting, as the result of this lawsuit, to solicit information from the government on a "state secret" matter. Rather, they are attempting to remedy "widespread violations of individual constitutional rights" occurring in a program whose existence has been made public. *See Hepting v. AT&T*, 439 F. Supp. 2d 974, 993 (N.D. Cal. 2006).

*Totten*'s logic simply cannot be stretched to encompass the claims here, as they are brought by third-party plaintiffs against non-government defendant actors for their involve-

---

dom of Information Act (FOIA). *Weinberger*, which has a FOIA element, was decided on FOIA grounds and *Totten* grounds, and relevant here is the *Totten*-related decision. *See Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 146 (1981). The FOIA cases are easily distinguishable. The FOIA cases entail litigation for the sole and independent purpose of obtaining disclosure of classified information. *See* 5 U.S.C. § 552(a)(4)(B); *see also, e.g.*, *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (addressing the court's authority under FOIA to order the disclosure of classified information for publication in a book). While "an informed citizenry [is] vital to the functioning of a democratic society," *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 (2001) (internal quotations omitted), the balance of interests will more often tilt in favor of the Executive when disclosure is the primary end in and of itself. FOIA therefore predictably entails greater deference to the national classification system than does the state secrets doctrine.

ment in tortious activities.[10] Nothing Plaintiffs have done supports a conclusion that their "lips [are] to be for ever sealed respecting" the claim on which they sue, such that filing this lawsuit would in itself defeat recovery. *See Totten*, 92 U.S. at 106.

Instead of "avoid[ing] difficult questions about the precise scope of the *Totten* bar" [Maj. Op. at 13543], the majority ought to have found the *Totten* bar inapplicable, and rejected the district court's analysis.[11] *Totten* cannot and does not apply to Plaintiffs' claims.

### The **Reynolds** *Evidentiary Privilege*

The majority correctly describes *Reynolds* as a rule of evidence, which only the government may assert. [Maj. at 13534-35]. However, *Reynolds* cannot, as the majority contends, be asserted during the pleading stage to excise entire allegations.

The majority argues that because pleadings can serve as evidence, *see Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996); *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980), the state secrets privilege "may be asserted at any time, even at the pleading stage." [Maj. Op. at 13535-36].

---

[10]*See Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 907 (N.D. III. 2006) (refusing to apply *Totten* because "the plaintiffs in this case were not parties to the alleged contract nor did they agree to its terms; rather, they claim that the performance of an alleged contract entered into by others would violate their statutory rights"); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 438 F. Supp. 2d 754, 763 (E.D. Mich. 2006) (refusing to apply *Totten* because it "applies [only] to actions where there is a secret espionage relationship between the Plaintiff and the Government"), *vacated on other grounds*, 493 F.3d 644 (6th Cir. 2007).

[11]Nor can the choice to affirm the district court under *Reynolds* be justified as an affirmance on "any basis supported by the record." [Maj. Op. at 13543]. The result the majority seeks here, a dismissal of Plaintiffs' case in its entirety, is not supported by the case law.

Thus, the majority argues, this court would be incorrect to conclude that neither the Federal Rules nor *Reynolds* would permit us to dismiss this case at the *pleadings stage* on the basis of an evidentiary privilege that must be invoked *during discovery* or *at trial*. In the majority's view, the privilege applies at the pleadings stage in such a manner that permits it to remove from a complaint any allegations where "secret and nonsecret information cannot be separated." [Maj. Op. at 13538].

Whatever validity there may be to the idea that evidentiary privileges can apply at the pleadings stage, it is wrong to suggest that such an application would permit the removal of *entire allegations* resulting in out-and-out dismissal of the entire suit. Instead, the state secrets privilege operates at the pleadings stage to except from the implications of Rule 8(b)(6) the refusal to answer certain allegations, not, as the government contends, to permit the government or Jeppesen to avoid filing a responsive pleading at all. [Maj. Op. at 13544-45]. In the Fifth Amendment context, the Fourth Circuit has explained that the privilege against self-incrimination "protects an individual . . . from answering specific allegations in a complaint or filing responses to interrogatories in a civil action where the answers" would violate his rights under the privilege. *N. River Ins. Co., Inc. v. Stefanou*, 831 F.2d 484, 486-87 (4th Cir. 1987). Accordingly, "when properly invoked, the fifth amendment privilege against self-incrimination . . . can avoid the operation of Rule [8(b)(6)]." *Id.* at 487.

But a proper invocation of the privilege does not excuse a defendant from the requirement to file a responsive pleading; the obligation is to answer those allegations that can be answered and to make a specific claim of the privilege as to the rest, so the suit can move forward. *Id.* (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1280, at 360 (1969)).

According to this rationale, Plaintiffs are correct that the government moving forward may assert the state secrets privilege to prevent Jeppesen from answering any allegations, where the answer would constitute evidence properly protected by the privilege. But, recognizing that the privilege may apply at the pleadings stage to prevent defendants from answering certain allegations vis-a-vis operation of Rule 8(b)(6) does not mean the privilege can be used to remove altogether certain subject matters from a lawsuit. Observing that pleadings may constitute evidence, in other words, does not transform an evidentiary privilege into an immunity doctrine.[12] The state secrets privilege, as an evidentiary privilege,

---

[12]It is not at all clear that the *Reynold*s privilege can be asserted at the pleading stage, as the majority claims. [*See* Maj. Op. at 13535]. *Ellsberg v. Mitchell*, 709 F.2d 51, 52 (D.C. Cir. 1983), on which the majority relies, involved the formal claim of state secrets privilege entered by the United States *in opposition to the plaintiffs' motion to compel discovery* and, while the opinion references the government's amended answer to the complaint in a footnote, it focuses centrally on the refusal of the defendants "to respond to any of the plaintiffs' remaining allegations or questions" as presented in the plaintiffs' submitted interrogatories. *Id.* at 53-54 & n.6. In *Black v. United States*, 62 F.3d 1115, 1117 (8th Cir. 1995), on which the majority also relies, the Eighth Circuit dismissed a suit against the CIA by an electrical engineer with government security clearances at the pleading stage because the main information Black sought in his complaint, which would "confirm or deny Black's alleged contacts with government officers," was the basis of Black's claim. Without it, his suit could not go forward. Here, where Plaintiffs arguably have ample public information to proceed with their suit, we do not have such a cut-and-dried case of privilege. [*See* Dissent App'x].

Moreover, pleadings are not considered evidence. *See United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995) ("The government's assertions in its pleadings are not evidence."); *S. Pac. Co. v. Conway*, 115 F.2d 746, 750 (9th Cir. 1940) ("[T]he office of a pleading is to state ultimate facts and not evidence of such facts."). If the government is seeking to excise entire allegations with the invocation of the privilege at the pleading stage, such an invocation would require an assertion that the *very subject matter* of the lawsuit is a state secret, and not the assertion of an evidentiary privilege. *See Moliero v. FBI*, 749 F.2d 815, 821 (D.C. Cir. 1984) (where "the whole object of the suit and of the discovery is to estab-

is relevant not to the sufficiency of the *complaint*, but only to the sufficiency of evidence available to later *substantiate* the complaint.

Because the *Reynolds* privilege, like any other evidentiary privilege, " 'extends only to [evidence] and not to facts,' " *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)), it cannot be invoked to prevent a litigant from persuading a jury of the truth or falsity of an allegation by reference to non-privileged evidence, regardless whether privileged evidence might also be probative of the truth or falsity of the allegation.[13]

---

lish a fact that is a state secret," compliance with discovery as a whole can be "excused in gross, without the necessity of examining individual documents"); *cf. Al-Haramain*, 507 F.3d at 1197 (applying *Reynolds* directly to evidence—a sealed document—where privilege was asserted in response to government's accidental disclosure of documents to the plaintiffs, and declining to find "the very subject matter" of the suit to be a state secret). Here, while the majority declines to reach the *Totten* bar question, the "very subject matter" of this lawsuit—Jeppesen's involvement in an overseas detention program—has been publicly acknowledged and is not a state secret.

[13]Contrary to the majority's assertion, the *Reynolds* privilege cannot be asserted prospectively, without an examination of the evidence on an item-by-item basis. To conclude that *Reynolds*, like *Totten*, applies to prevent the litigation of allegations, rather than simply discovery of evidence, would be to erode the distinction between the two versions of the doctrine. Moreover, the Eighth Circuit case on which the majority relies, *Black*, 62 F.3d at 1117, was ultimately not a prospective assertion of the *Reynolds* privilege. While the government asserted the privilege in response to the plaintiff's amended complaint, ultimately, the privilege was asserted as to one piece of information, without which the plaintiff could not proceed; he could not bring an intentional infliction of emotional distress claim against the CIA without information about any existing contacts with government officers. *Id.* The information on his contacts, which the plaintiff attempted to solicit via his complaint, was privileged. *Id.* To say *Black* permits the assertion of the *Reynolds* privilege in the pleading stage is to misstate its holding.

### Reynolds *and Rule 12(b)(6)*

The majority claims there is "no feasible way to litigate Jeppesen's alleged liability *without creating an unjustifiable risk of divulging state secrets*,"**14** [Maj. Op. at 13548], ignoring well-established principles of civil procedure which, at this stage of the litigation, do not permit the prospective evaluation of hypothetical claims of privilege that the government has yet to raise and the district court has yet to consider.

Our task in reviewing the grant of a Rule 12 motion to dismiss "is necessarily a limited one." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). We are not to determine whether a particular party will ultimately prevail, but instead only whether the complaint "state[s] a claim upon which relief can be granted," Fed. R. Civ. Pro. 12(b)(6). If Plaintiffs here have stated a claim on which relief can be granted, they should have an opportunity to present evidence in support of their allegations, without regard for the likelihood of ultimate success. *See Scheuer*, 416 U.S. at 236 (a district court acts "prematurely" and "erroneously" when it dismisses a well-pleaded complaint, thereby "preclud[ing] any opportunity for the plaintiffs" to establish their case "by subsequent proof"); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it appears 'that a

---

**14**The majority cites *El-Masri v. United States*, 479 F.3d 296, 308-13 (4th Cir. 2007), as a comparable case wherein the court found further litigation risked disclosure of state secrets and threatened grave harm to American national security. [Maj. Op. at 13548, citing *El-Masri*, 479 F.3d at 312]. However, noting that the Fourth Circuit appears to have "merged the concept of 'subject matter' with the notion of proof of a prima facie case," this court in *Al-Haramain* expressly rejected *El-Masri*'s logic. 507 F.3d at 1201. In the Ninth Circuit, "the 'subject matter' of a lawsuit [is not necessarily] one and the same [as] the facts necessary to litigate the case." *Id.* Accordingly, "[b]ecause the Fourth Circuit has accorded an expansive meaning to the 'subject matter' of an action, one that we have not adopted, *El-Masri* does not support dismissal based on the subject matter of the suit." *Id.*

recovery is very remote and unlikely.' " (quoting *Scheuer*, 416 U.S. at 236)).

This limited inquiry—a long-standing feature of the Rules of Civil Procedure—serves a sensible judicial purpose. We simply cannot resolve whether the *Reynolds* evidentiary privilege applies without (1) an actual request for discovery of specific evidence, (2) an explanation from Plaintiffs of their need for the evidence, and (3) a formal invocation of the privilege by the government with respect to that evidence, explaining why it must remain confidential. *See Reynolds*, 345 U.S. at 8-9 ("the principles which control the application of the privilege" require a "formal claim of privilege" by the government with respect to the challenged evidence); *id.* at 10-11 (the court must consider the litigants' "showing of necessity" for the requested evidence in determining whether "the occasion for invoking the privilege is appropriate"). Nor can we determine whether the parties will be able to establish their cases without use of privileged evidence without also knowing what non-privileged evidence they will marshal. *See Crater Corp. v. Lucent Techs., Inc.*, 423 F.3d 1260, 1267-68 (Fed. Cir. 2005) ("deciding the impact of the government's assertion of the state secrets privilege" before the record is "adequately developed" puts "the cart before the horse"). Thus neither the Federal Rules nor *Reynolds* would permit us to dismiss this case for "failure to state a claim upon which relief can be granted," Fed. R. Civ. Pro. 12(b)(6), on the basis of an evidentiary privilege relevant, not to the sufficiency of the complaint, but only to the sufficiency of evidence available to later substantiate the complaint.[15]

---

[15]While the government styled its motion below as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," the district court did not grant summary judgment, but rather dismissal—and it could not have done otherwise. A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c). Here, because Jeppesen has not even answered the com-

A decision to remand would have the additional benefit of conforming with "the general rule . . . that a federal appellate court does not consider an issue not passed on below," and will allow the district court to apply *Reynolds* in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Johnson v. California*, 543 U.S. 499, 515 (2005) (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 557-58 (1994) (reversing and remanding for the lower court to apply the correct legal standard in the first instance)).

The majority's analysis here is premature. This court should not determine that there is no feasible way to litigate Jeppesen's liability without disclosing state secrets; such a determination is the district court's to make once a responsive pleading has been filed, or discovery requests made. We should remand for the government to assert the privilege with respect to secret evidence, and for the district court to determine what evidence is privileged and whether any such evidence is indispensable either to Plaintiffs' prima facie case or to a valid defense otherwise available to Jeppesen. Only if privileged evidence is indispensable to either party should it dismiss the complaint.

### Conclusion

The majority concludes its opinion with a recommendation of alternative remedies. Not only are these remedies insuffi-

---

plaint, it is uncertain which allegations are in dispute, much less which disputes might raise genuine issues of material fact.

The procedural posture of this case thus differs fundamentally from that in *Kasza*, which involved a grant of summary judgment. *See Frost v. Perry*, 191 F. Supp. 1459, 1465-67 (D. Nev. 1996), *aff'd sub nom Kasza*, 133 F.3d 1159 (granting summary judgment because "the privilege, as invoked, covered various items of discovery requested by Plaintiffs," including "various photographic exhibits" and "under seal . . . affidavits," and therefore "Plaintiffs have failed to establish a genuine issue as to any material fact without running afoul of the military and state secrets privilege").

cient, but their suggestion understates the severity of the consequences to Plaintiffs from the denial of judicial relief. Suggesting, for example, that the Executive could "honor[ ] the fundamental principles of justice" by determining "whether plaintiffs' claims have merit," [*see* Maj. Op. at 13554] disregards the concept of checks and balances. Permitting the executive to police its own errors and determine the remedy dispensed would not only deprive the judiciary of its role, but also deprive Plaintiffs of a fair assessment of their claims by a neutral arbiter. The majority's suggestion of payment of reparations to the victims of extraordinary rendition, such as those paid to Japanese Latin Americans for the injustices suffered under Internment during World War II, over fifty years after those injustices were suffered [Maj. Op. at 13554], elevates the impractical to the point of absurdity. Similarly, a congressional investigation, private bill, or enacting of "remedial legislation," [Maj. Op. at 13556], leaves to the legislative branch claims which the federal courts are better equipped to handle. *See Kosak v. United States*, 465 U.S. 848, 867 (1984) (Stevens, J., dissenting).

Arbitrary imprisonment and torture under any circumstance is a " 'gross and notorious . . . act of despotism.' " *Hamdi v. Rumsfeld*, 542 U.S. 507, 556 (2004) (Scalia, J., dissenting) (quoting 1 *Blackstone* 131-33 (1765)). But " 'confinement [and abuse] of the person, by secretly hurrying him to [prison], where his sufferings are unknown or forgotten; is a less public, a less striking, and therefore a more dangerous engine of arbitrary government.' " *Id.* (Scalia, J., dissenting) (quoting 1 *Blackstone* 131-33 (1765)) (emphasis added).

I would remand to the district court to determine whether Plaintiffs can establish the prima facie elements of their claims or whether Jeppesen could defend against those claims without resort to state secrets evidence.